445 S.E.2d 243

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**JESSICA M., Kenneth E., Jr., and Angela E., Infant(s) Under the Age of 18 Years, Defendants Below, Appellants.**

**Kenneth E. and Maria E., Parents of Said Infants, Appellees.**

**James M. and Carrie M., Intervenors Below.**

No. 21920.

Supreme Court of Appeals of West Virginia.

Submitted May 3, 1994.

Decided May 31, 1994.

---

17. These provisions are set out and discussed in    note 5, *supra.*

Darrell V. McGraw, Jr., Atty. Gen. and L. Eugene Dickinson, Asst. Atty. Gen., Charleston, for appellee State of W.Va.

Susan L. Riffle, Fairmont, for appellants.

James Zimarowski, Morgantown, for appellee Maria E.

Patrick N. Wilson, Wilson, Fucillo & Shields, Fairmont, for intervenors James M. and Carrie M.

PER CURIAM:

This case [1] was originally presented to this Court on March 2, 1994,[2] at which time the appellants, Jessica M.[3] and Kenneth E., Jr.[4], infants under the age of eighteen years, sought reversal of the April 30, 1993, order entered in Marion County Circuit Court, which granted their mother, Maria E., a six-month improvement period and which denied the termination of her parental rights. By order dated March 15, 1994, we held in abeyance our decision whether to terminate Maria's parental rights and, instead, ordered the Department of Health and Human Resources ("DHHR") to conduct a current investigation and home study of the maternal grandparents, intervenors James and Carrie M., with whom the children have resided since January 11, 1993. The order further directed the DHHR to appear before this Court on May

---

1. Though Angela E. and Kenneth E., Sr.'s names appear in the style of the case, they are deceased. Angela died on June 22, 1992, while Kenneth, Sr. died on January 24, 1993.

2. Appearing before this Court on March 2, 1994 were Susan Riffle, guardian ad litem, on behalf of Jessica and Kenneth, Jr., James B. Zimarowski, on behalf of Maria E., and Patrick N. Wilson, on behalf of James and Carrie M. The DHHR did not appear.

3. Jessica apparently has no contact with her biological father, Frank Z. His whereabouts are unknown and his paternal rights are presently not at issue.

4. We adhere to our traditional practice of styling domestic relations and juvenile cases involving sensitive matters and do not use the last names of the parties. *See In re Scottie D.,* 185 W.Va. 191, 406 S.E.2d 214 (1991); *David M. v. Margaret M.,* 182 W.Va. 57, 385 S.E.2d 912 (1989).

3, 1994, to discuss the results of the investigation and home study.

On May 3, 1994, counsel for the parties and the DHHR appeared before this Court[5], at which time the DHHR presented the results of the current investigation and home study and its ultimate recommendation as to the disposition of this case.[6] Upon consideration of the petition, the briefs and arguments of counsel and the results and recommendations of the DHHR's current investigation and home study of James and Carrie M., we conclude that this case should be remanded.

I

Seven-week old Angela E. died, according to the autopsy report, of "blunt force craniocerebral traumatic injuries," the result of a "homicide." The autopsy report further indicated that the infant Angela had also sustained five broken ribs, which were at various stages of healing, a broken clavicle and many bruises. Though Angela's parents, Maria and Kenneth, Sr., offered several explanations for Angela's injuries, none of them comported with the medical evidence.

Maria initially stated that she had placed Angela in her bassinet and had rolled her over the heating ducts at home. Maria believed that the jarring of the bassinet could have caused the extensive head injury. Maria further indicated that she had walked Angela through the hallways, zigzagging while walking and could have hit Angela's head on the door frame or wall.

After Angela's death, however, her parents offered the following explanation: On June 18, 1992, several nights prior to Angela's death, Maria and Kenneth, Sr. were leaving the home of Kenneth, Sr.'s parents, when the baby carrier in which Angela was being carried, broke, jostling Angela around. Though Angela began to cry, Maria found nothing wrong with her. Angela cried and slept a good deal after this baby carrier incident, but her parents were not alarmed because she was a colicky baby who apparently cried a lot. In the early morning hours of June 21, 1992, Maria got up with Angela when she began to cry. Maria fed her and put her back to bed, not noticing any injuries to Angela at that time. Later, when Angela began to cry again, Kenneth, Sr. got up with her. Maria eventually got up to fix Angela another bottle. When she took Angela from Kenneth, Sr., Maria noticed dried blood in the baby's nose, though it is unclear whether Maria noticed the large knot on the left side of Angela's head.[7] Angela died on June 22, 1992.

James L. Frost, M.D., a forensic pathologist for the Medical Examiner's Office of the State of West Virginia, performed an autopsy on Angela and testified at the hearing to determine Maria's parental rights to Jessica and Kenneth, Jr., on July 6, 1993. According to Dr. Frost, Angela's autopsy revealed that she sustained recent head injuries, including "contusions of the brain in multiple locations, swelling of the brain and hemorrhage along the left optic nerve."[8] The autopsy further revealed a fracture of the right clavicle, or collar bone, and fractures of the posterior portion of the right seventh and eleventh ribs, as well as an enlargement of the posterior portion of the eight, ninth and tenth

---

5. Senior Assistant Attorney General L. Eugene Dickinson appeared on behalf of the DHHR.

6. Also submitted and considered by this Court were Maria E.'s *Objection to Department of Health and Human Services' Home Study and Narrative Opinion Report* and James and Carrie M.'s *Objection to the Department of Health and Human Services Home Study and Investigative Report*, which, among other things, questions the objectivity of the DHHR in this case and challenges the validity of the report in that neither Maria nor James nor Carrie M. were given the opportunity to cross-examine the DHHR workers who prepared the report. We emphasize that the DHHR's current investigation and home study were not dispositive of this Court's ruling. Rather, it was merely one of many factors considered by this Court.

7. While the hospital admissions records indicate that Maria told the nurses that she did not see the knot on Angela's head, Maria told police the next day that she did see the knot.

8. Dr. Frost further testified that a great deal of force would be necessary to cause the skull fractures sustained by Angela: "It would be not as much force as would be needed to do the same thing in an adult, because of an infant's skull being much thinner, but it's not a light tap or a light slap. It's a good, substantial blow."

ribs.[9] Due to the callous formation in the fractures of the ribs and clavicle, Dr. Frost believed the fractures to be from ten days to three weeks old.[10] The injury to Angela's head, however, was recent, occurring one to two days before her death.

The explanations offered to account for Angela's injuries did not comport with the medical evidence. According to medical records, Angela's birth was unremarkable, with no complications. Thus, Dr. Frost had no reason to believe that Angela's injuries occurred during the birthing process. Furthermore, because Angela was only seven weeks old, she could not have inflicted the injuries to her clavicle, ribs and head herself.[11]

As a result of the parents' explanation that Angela's injury may have been caused by the baby carrier incident, the baby carrier was retrieved from Wal–Mart for examination.[12] Dr. Frost indicated that the injury to Angela's head could not have occurred as described. With the handle of the baby carrier in the position in which it would be carried, it was shaken violently. Though the handle moved one notch, the handle did not slide. Thus, in Dr. Frost's opinion, Angela could not have slid out or otherwise have been harmed. Furthermore, Dr. Frost found no evidence of trauma along the side of the seat where Angela's head would have been. Finally, because the baby carrier is raised, like a wing chair, Angela's head would have been supported by the padded interior if the baby carrier were bumped while Angela was in it.[13]

When Angela was admitted to the hospital, on June 21, 1992, and it became evident that a credible explanation for her injuries was not forthcoming; the DHHR intervened and was granted custody of Jessica and Kenneth, Jr.[14] Upon subsequent examination of Jessica and Kenneth, Jr.'s [15] medical records, it was revealed that Kenneth, Jr. had healed anterior rib fractures, though the date of injury could not be determined. Maria testified that she was unaware that Kenneth, Jr. had any broken ribs. Medical records further revealed that Kenneth, Jr. had suffered a broken leg at age five weeks. Maria's initial explanation to Kenneth, Jr.'s physician was that she believed the knot that had developed on Kenneth, Jr.'s leg was the result of an insect bite. Maria later explained that Kenneth, Jr. had a cyst on the bone,

9.  Though the eighth, ninth and tenth ribs were not excised for histological study, Dr. Frost testified that they were also healing fractures.

10.  Dr. Frost testified that the cause of the injuries to the clavicle and ribs was

> a blunt force applied to that area of the body causing the rib fractures. It could be a blow or it could be—of the ribs. It could be a blow to the body over those areas, the clavicle and the ribs, or those to the ribs could be to the body being held in the hand and the chest squeezed, or it could be pressure applied with the body on a hard surface, but I think I would favor the chest being held and squeezed.

11.  Dr. Frost indicated that a child with injuries such as Angela's would cry a lot due to pain, tend to favor one side over the other and would try to protect the injured area. However, if the child was not taken to the doctor immediately, the pain would subside as healing of the injury progressed and it would be more difficult for the physician to find the injury. According to Maria, Angela saw a physician when she was three weeks and four weeks old.

12.  Maria and Kenneth, Sr. returned the baby carrier to Wal–Mart, where it was purchased, believing it was defective.

13.  Dr. Frost actually positioned Angela's body in the baby carrier during the autopsy.

14.  *W.Va.Code* 49–6–3(c) [1992] provides, in relevant part:

> If a child or children shall, in the presence of a child protective service worker of the division of human services, be in an emergency situation which constitutes an imminent danger to the physical well-being of the child or children, as that phrase is defined in ... [§ 49–1–3], ... and if such worker has probable cause to believe that the child or children will suffer additional child abuse or neglect or will be removed from the county before a petition can be filed and temporary custody can be ordered, the worker may, prior to the filing of a petition, take the child or children into his or her custody without a court order: Provided, That after taking custody of such child or children prior to the filing of a petition, the worker shall forthwith appear before a circuit judge or a juvenile referee of the county wherein custody was taken ... and shall immediately apply for an order ratifying the emergency custody of the child pending the filing of a petition[.]

15.  Jessica was born on October 27, 1987 and Kenneth, Jr. on June 16, 1991.

causing it to break. Hospital records include a notation from Dr. Koay, suggesting that Kenneth, Jr. was possibly a victim of child abuse.

Jessica, the only child old enough to be interviewed by the DHHR, recounted the abuse she and her brother and sister suffered at the hands of Kenneth, Sr. She told counselors and other interviewers that she believed Kenneth, Sr. had hit Angela in the head with a hammer. She also saw Kenneth, Sr. hitting the younger Kenneth's head against the bed. However, her mother's only response to this was to tell her husband to stop. Jessica further told her counselor that it was Kenneth, Sr. who had broken her brother's leg.

In addition to describing how Kenneth, Sr. abused her siblings, Jessica also described the abuse that he inflicted upon her. If she sucked her fingers, Kenneth, Sr. would pull them back until they hurt. She also related to DHHR workers how he had hit her with a spoon and would hold her nose and put his hand over her mouth so that she could not breathe. Though Maria would sometimes be present when her husband abused her children, according to Jessica, her mother's only reaction would be to tell him to stop.

In its April 30, 1993, order, the trial court refused to terminate the parental rights of Maria, instead, granting her a six-month improvement period. At the end of the improvement period, the trial judge ordered a review hearing during which the court would examine written reports from psychologists and counselors with the aim towards family reunification if appropriate. The DHHR was ordered to retain legal custody of the children, while the maternal grandparents, James and Carrie M., were ordered to retain physical custody. Maria was given liberal visitation with her children on the condition that the visitations be supervised by at least one of the maternal grandparents.

On October 13, 1993, an evidentiary hearing was held wherein expert and lay testimony of the parties' then current situation was offered.[16] Dr. Jennifer Cummings, a clinical psychologist who counseled both Jessica [17] and her grandmother, Carrie M.[18], testified that Jessica is adjusting well in her current living situation and that she has no concerns about Carrie M.'s custodial care of Jessica and Kenneth, Jr. Though Dr. Cummings originally indicated that Maria failed to protect her children by not intervening and stopping the abuse of her children by her husband, Kenneth, Sr., she later testified, at the October 13, 1993 hearing, that the suicide of Kenneth, Sr., on January 23, 1993, altered her view. She stated that when Kenneth, Sr. was alive and involved in parenting, the children were at risk. However, Dr. Cummings believes that the death of Kenneth, Sr. eliminated that risk. Finally, she opined that it would be in the best interests of Jessica and Kenneth, Jr. to be returned to their mother.[19]

Similarly, Dr. Ronald Pearse, a psychologist who has treated Maria since October 1992,[20] testified at the October 13, 1993 hearing that Maria does not represent a danger to her children and that it would be in the children's best interest to be returned to their mother. Dr. Pearse further testified that, though Maria's husband has been strongly suspected of abusing her children

---

16. The trial judge deferred ruling on further placement of the children until this appeal is decided.

17. Jessica's counseling sessions with Dr. Cummings have ceased. According to Dr. Cummings, Jessica is no longer in need of therapy.

18. Dr. Cummings believed that Kenneth, Jr. was too young to benefit from psychotherapy. Carrie M. accompanied Jessica to her sessions with Dr. Cummings and participated in parent training, or parent education. According to Dr. Cummings, Carrie M. did everything asked of her.

19. Dr. Cummings testified that Maria's failure to adequately explain the cause of the injuries to her children "raises questions" and that she would have inquired into those issues had Maria been her patient. While Dr. Cummings' recommendation that Jessica and Kenneth, Jr. be returned to their mother was based on conversations with Maria's mother, Carrie M., Jessica, and one meeting with Maria herself, Dr. Cummings did not consult with Maria's therapist before making this recommendation.

20. Dr. Pearse first began treating Maria and her husband, Kenneth, Sr., both individually and jointly. Following Kenneth, Sr.'s death, Maria continued individual counseling sessions.

and causing the death of Angela,[21] Maria has never identified her husband as the abuser nor directly acknowledged his abusive behavior. Nevertheless, Dr. Pearse opined that there is little risk that Maria would fail to protect her children in the future.

Also testifying at the October 13, 1993 hearing was Mrs. Joyce Evans, Jessica's kindergarten teacher at Monongah Elementary School. Mrs. Evans testified that Jessica was one of her best students and appears to be happy and well-adjusted.

## II

■ As indicated in our order of March 15, 1994, the primary issues on appeal concern the trial court's refusal to terminate Maria's parental rights to Jessica and Kenneth, Jr., in light of her failure to protect her children from the abuse inflicted upon them and upon Angela, by her husband, Kenneth, Sr., and her refusal to identify the abuser. We ordered the DHHR to conduct a current investigation and home study of the children's current living arrangements, keeping in mind that the results and recommendations the DHHR makes should protect the best interests of the children. *See John D.K. v. Polly A.S.*, 190 W.Va. 254, 438 S.E.2d 46 (1993).

■ In syllabus point 5 of *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973), this Court stated: "Though constitutionally protected, the right of the natural parent to the custody of minor children is not absolute and it may be limited or terminated by the State, as *parens patriae*, if the parent is proved unfit to be entrusted with child care." The current investigation and home study of the children's maternal grandparents, James and Carrie M., revealed, according to the DHHR, a caring and loving environment. The DHHR workers found that James and Carrie M. have adequately provided for the children's physical, educational and spiritual needs, with no allegations of abuse or neglect. According to the DHHR, James and Carrie M. have complied with all aspects of the April 30, 1993, order.[22] It is the DHHR's concern, however, that both Maria and her parents have minimized or distorted Kenneth, Sr.'s abusive behavior towards the children,[23] thus, suppressing Jessica's recollection of what occurred. This "potential for emotional damage to the children" can only be thwarted, in the DHHR's view, by terminating the parental rights of Maria and by granting permanent custody of the children to the DHHR.

Jessica and Kenneth, Jr. are apparently thriving in their grandparents' care. Indeed, a powerful bond has been formed between them, as well as between the children and their mother, who has been active in their daily lives. While this Court is aware of the immeasurable harm which would undoubtedly occur to Jessica and Kenneth, Jr.[24] if they were to be abruptly removed from their grandparents' home, we are infinitely more concerned with the past abuse of these children, the death of their sister, Angela, Maria's failure to protect them from abuse and her refusal to identify the abuser.

In *In Interest of Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985), this Court terminated a father's parental rights for his failure to protect his child. The father argued that he

---

21. According to Marion County Sheriff Ron Watkins, initially, Maria and Kenneth, Sr. were suspects in the investigation of Angela's death. However, following the suicide of Kenneth, Sr., Maria was no longer a focus of any investigation into Angela's death.

22. As we noted earlier, Maria was granted liberal visitation of her children, on the condition that her visits be supervised by at least one of the maternal grandparents. The record indicates that Maria visits her children daily and has fully complied with the conditions of visitation.

23. For instance, in the DHHR's interview with Jessica, she stated that Kenneth, Sr. "didn't know how to play" when he would choke her and when he banged Kenneth, Jr.'s head against the baby bed.

24. The tender age of Kenneth, Jr., who is now two years and eleven months old, is of particular concern to this Court. As we noted in *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991) (citing White, The First Three Years of Life at v. (1985)), the experiences of the first three years of a child's life form the foundation for all his later development. *Id.* 408 S.E.2d at 375. It cannot be ignored that Kenneth, Jr. has been in his grandparents' care since he was one and one-half years old.

should be held blameless for his nonaction in protecting his child, even though he supported his wife's explanation for their 38–day old infant's life-threatening injuries. In *Darla B.*, as in this case, the parents' testimony was inconsistent with all of the medical evidence as to the manner in which the infant's injuries occurred.

■ As we indicated earlier, it is further troubling to this Court that Maria has failed to acknowledge Kenneth, Sr.'s abusive behavior towards her children and to identify him as the abuser. In our recent decision of *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993), we held in syllabus point 3 that "[p]arental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." [25]

Guardian ad litem Susan Riffle acknowledged, before this Court, that Jessica and Kenneth, Jr. have formed important attachments to their mother, Maria, and to their grandparents, James and Carrie M. It is, thus, her concern that these young children may be irreparably harmed if they were to be removed from their present environment. It is the recommendation of the DHHR, however, that it be granted permanent custody of Jessica and Kenneth, Jr., that physical custody of the children be returned to it, that the parental rights of Maria be terminated, that a hearing be set to determine the parental rights of Jessica's biological father, Frank Z., and that the permanent plan for the children be adoption.

The record of this case does not prescribe a simple solution. Considering the current living arrangements, which, for the most part, have been favorable to the children, vis-a-vis the past abuse of the children by Kenneth, Sr. and Maria's failure to acknowledge such abuse, and her potential to enter into another abusive relationship, we are unable to determine the placement that would best serve the interests of Jessica and Kenneth, Jr. We shall, therefore, require the DHHR to update its current investigation and home study of the maternal grandparents, James and Carrie M., within six months from the date of this opinion, for trial court review and decision. In the interim, legal custody of Jessica and Kenneth, Jr. shall remain with the DHHR. The maternal grandparents, James and Carrie M., shall retain physical custody of the children, with liberal visitation of the children given to their mother, Maria, with the stipulation that the visitations shall be supervised by one or both of the maternal grandparents.

Based upon the above, this case will be remanded to the Circuit Court of Marion County for further proceedings in accordance with *W.Va.Code*, 49–6–1, *et seq.* Upon receipt of the updated current investigation and home study, the circuit court shall promptly ascertain appropriate custody of Jessica and Kenneth, Jr., based upon current considerations.

Remanded.

---

**25.** Notably, our decision in *In re Jeffrey R.L.* was rendered June 14, 1993, after the trial court's April 30, 1993 order, which granted Maria a six-month improvement period.