452 S.E.2d 737

**In the Interest of RENAE EBONY W., a Child Under the Age of 18 Years.**

**No. 22556.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 29, 1994.

Decided Dec. 21, 1994.

422

E. Kent Hellems, Gorman, Sheatsley & Co., L.C., Beckley, Guardian Ad Litem.

Joe Noggy, Public Defender, Beckley, for Paula W.

James M. Henderson, Abrams, Byron, Henderson & Richmond, Beckley, for Alonzo F.

Christen Keller, Chief Deputy Pros. Atty. for Raleigh County, Beckley, for Dept. of Health and Human Resources.

WORKMAN, Justice:

This matter is before the Court on appeal from an order of the Circuit Court of Raleigh County entered June 2, 1994, ratifying the emergency removal of the Appellant, Renae Ebony W.,[1] an infant child, from her parents' custody, but returning the child to her parents' physical custody for a three-month improvement period. The issue raised by Appellant E. Kent Hellems, the infant's guardian ad litem, is the propriety of the court's granting of an in-home improvement period once the child had been taken under emergency circumstances constituting imminent danger to the physical well-being of the child. We hold that the lower court erred in returning Renae Ebony to the immediate physical custody of her parents during the improvement period. For the reasons stated, we reverse the lower court's order insofar as it continued custody of Renae Ebony in her parents. We further order that temporary custody of Renae Ebony continue in the Department of Health and Human Resources ("DHHR") and that Renae Ebony's parents both submit to psychological evaluations and both be granted liberal visitation with her during the course of the court-supervised three-month improvement period, the terms of which should be developed by the lower court on remand.

I.

Renae Ebony was born on December 22, 1993, to Paula W. and Alonzo F. The guardian ad litem contends that both of the child's parents are low-functioning and mentally-impaired individuals who met while attending vocational rehabilitation in Charleston, West Virginia.

On February 16, 1994, the DHHR received a child abuse complaint regarding Renae Ebony which was made by Helen F., the child's paternal grandmother. Ms. Nancy Forsberg of DHHR traveled to the child's home in Beckley, West Virginia, to conduct an initial investigation into the allegations of child abuse. Upon arriving at the child's home, Ms. Forsberg found the child, who was then less than two months old, living in a two-bedroom apartment occupied by as many as seven other people. During Ms. Forsberg's visit, Helen F. advised her that Paula

1. Consistent with our practice in cases involving sensitive matters, we identify the parties through the use of initials. *See Benjamin R. v. Orkin Exterminating Company, Inc.*, 182 W.Va. 615, 390 S.E.2d 814, n. 1 (1990) (citing *In re Jonathan P.*, [182] W.Va. [302], [303] n. 1, 387 S.E.2d 537, 538 n. 1 (1989)); *State v. Murray*, 180 W.Va. 41, 375 S.E.2d 405, n. 1 (1988).

W., the child's natural mother, had been mistreating the child. Specifically, Ms. F. advised Ms. Forsberg that the child's mother had been heard spanking the baby, cussing the baby and calling the baby "a bitch." The child's father told Ms. Forsberg that he had seen Paula W. shaking the baby.

The DHHR, recognizing that a problem did exist, entered into an arrangement with Paula W. whereby she would enter the Florence Crittendon Home ("Home") in Wheeling, West Virginia, with Renae Ebony to learn better parenting skills. Ms. W. entered the Home at the end of February and stayed for approximately two weeks, at which time she left with the child, allegedly to visit her ailing father. Ms. W. was scheduled to return to the Home on March 14, 1994, but she refused to do so and on March 16, 1994, the DHHR filed its Petition in the circuit court, thereby initiating the underlying child abuse and neglect proceeding. An order was entered that same day, granting the DHHR temporary custody of Renae Ebony pending a hearing scheduled for March 17, 1994.

The March 17, 1994, hearing was held before Judge John C. Ashworth of the Circuit Court of Raleigh County for the purpose of hearing testimony to ratify the emergency taking of Renae Ebony by the DHHR. Michael Horton rendered testimony on behalf of the DHHR during the hearing. There were no other witnesses. At the close of the hearing, the Appellant recommended to the court that the child remain in the temporary legal and physical custody of the DHHR and that both of the child's parents undergo psychological evaluations. The court denied the Appellant's request, refused to ratify the emergency taking, and dismissed the case.

On March 24, 1994, a hearing was held on the motion of Appellant and the DHHR for reconsideration of the lower court's prior ruling. Several witnesses testified at this hearing. Helen F. testified that she initially contacted the DHHR regarding the allegations of abuse of Renae Ebony by her mother because she herself did not want to get into trouble if the child was injured. She also testified that she heard Paula W. yelling at the baby that she would "flush you down the toilet" or "throw you out the window" when the baby was less than one month old.

Stephanie F., the child's paternal aunt, also testified at the March 24, 1994, hearing. She testified that she was awakened one morning at approximately 2:30 a.m. by her boyfriend, who told her that he had actually seen Paula W. spanking the baby. Ms. Stephanie F., once awakened, witnessed this incident herself. She further testified that, during this same incident, she heard Ms. W. tell the child "shut up" or she would "stick" you. Ms. Stephanie F. characterized the blows as "hard-like" and stated that she could actually hear the baby being spanked.

■ At the close of the March 24, 1994, hearing, the guardian ad litem again requested that the lower court continue temporary custody of Renae Ebony with the DHHR and that the child's parents be ordered to undergo psychological evaluations. Although the lower court did reconsider its prior ruling and ratified the emergency removal of Renae Ebony from her parents' custody,[2] the court again refused to continue temporary custody of Renae Ebony with the DHHR, stating in-home placement was "the least intrusive alternative,"[3] and placed the child's parents on

2. On March 24, 1994, the court reconsidered its refusal to ratify the emergency taking and did ratify the emergency taking by order entered June 2, 1994. Even though the trial court ratified the emergency taking, the court, in comments from the bench, indicated that it believed there was insufficient evidence of imminent danger to the child. Although the ratification of the emergency taking is not at issue here, we are compelled to note that the record supports a finding of imminent danger to this child.

In addition, as more fully set forth herein, the DHHR attempted to develop a reasonably available alternative to removal by arranging the resi-

dential parenting training at the Florence Crittendon Home, but the mother's refusal to complete the program left no other reasonably available alternative.

3. Generally, the least restrictive alternative available regarding parental rights to custody of a child is appropriately considered at the dispositional stage in child abuse and neglect cases. See W.Va.Code § 49–6–5 (Supp.1994). The concept of least restrictive alternative may even be useful by way of analogy when dealing with improvement periods granted pursuant to a standard abuse and neglect petition filed under West

a three-month improvement period.[4]

Upon being advised of the court's ruling regarding temporary custody of Renae Ebony, the Appellant immediately moved the court for a stay of its order pending an appeal to this Court. The lower court denied the motion for stay. Thereafter, the Appellant filed a motion to stay the circuit court orders of May 27, 1994, and June 2, 1994,[5] which was granted by this Court. Consequently, temporary custody of Renae Ebony has remained with the DHHR pending this appeal.

## II.

■ West Virginia Code § 49–6–3 (Supp. 1994), provides in part:

Upon the filing of a petition, the court may order that the child alleged to be an

abused or neglected child be delivered for not more than ten days into the custody of the state department or a responsible relative, which may include any parent, guardian or other custodian pending a preliminary hearing, if it finds that: (1) There exists imminent danger to the physical well-being of the child, and (2) there are no reasonably available alternatives to removal of the child....

In syllabus point one of *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989) we held:

W.Va.Code, 49–6–3 (1984), authorizes, upon the filing of a petition, the immediate, temporary taking of custody of a child by the Department of Human Services when there exists an imminent danger to the

Virginia Code § 49–6–1 (Supp.1994). The concept, however, has little value in an emergency taking proceeding under West Virginia Code § 49–6–3 (Supp.1994) where a child has been removed from the custody of its parents based on a finding of imminent danger. In such cases, the placing of the child in a safe environment away from the alleged abusing adult until the problems giving rise to imminent danger are remedied should be of the utmost concern to the court.

4. The terms of the improvement period were as follows:

1. Both Respondents shall submit to parenting skills[,] education and other counseling services under West Virginia Department of Health and Human Resources direction; both promptly shall receive psychological, psychiatric and parental evaluations at FMRS Mental Health Council, Inc., with results promptly to be provided this Court and all parties.

2. Both Respondents, and the grandmother and all other persons residing with the infant or acting in a custodial capacity are herein restrained from using corporal punishment of any kind or nature upon the infant, or using any degree of force against her, including but not limited to spanking, striking, shaking, throwing; further, the Respondents and the other described parties are hereby restrained from cursing at or otherwise verbally abusing the infant; and the Respondents and other described persons are hereby notified, in open court in their presence, that each Respondent and every other household member has a duty to report to the Department of Health and Human Resources, or to police or to the State or Guardian ad Litem, any knowledge of any other person's prohibited conduct against the infant, and that failure to do so may subject the non-reporting party to prosecution.

3. Respondents shall cooperate with regular home monitoring by the Department of Health and Human Resources and with any home services deemed necessary by the Department of Health and Human Resources.

5. The June 2, 1994, order entered by the trial court reinstating and ratifying the removal of the child is a cursory order which does not include findings of fact and conclusions of law consistent with the statutory requirements. We once again urge the trial courts to be more thorough in making findings of fact and conclusions of law in child abuse and neglect cases, and to comply with statutory requirements before entering orders.

This Court has repeatedly recognized that it is incumbent on all courts to be especially vigilant in protecting the welfare of children of the tender age of three years or less. *See State v. Jessica M.*, 191 W.Va. 302, 307, 445 S.E.2d 243, 248 n. 24 (1994) (specifically noting the child's age of two years, eleven months as being "of particular concern to this Court"); *In re Jeffrey R.L.*, 190 W.Va. 24, 33, 435 S.E.2d 162, 171 (1993) (recognizing that "termination of parental rights is even more appropriate in cases where the welfare of a child less than three years of age is seriously threatened"); *In Interest of Carlita B.*, 185 W.Va. 613, 623, 408 S.E.2d 365, 375 (1991) (quoting various authorities on the critical importance of a child's first three years of life); Syl.Pt. 1, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980) (holding that "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years....").

physical well-being of the child and there are no reasonably available alternatives to the removal of the child.

*Id.* at 302–03, 387 S.E.2d at 538.

Imminent danger to the physical well-being of the child is statutorily defined as:

an emergency situation in which the welfare or the life of the child is threatened. Such emergency situation exists when there is reasonable cause to believe that any child in the home is or has been sexually abused or sexually exploited, or reasonable cause to believe that the following conditions threaten the health or life of any child in the home:

(1) Nonaccidental trauma inflicted by a parent, guardian, custodian, sibling or a babysitter or other caretaker; or

(2) A combination of physical and other signs indicating a pattern of abuse which may be medically diagnosed as battered child syndrome; or

(3) Nutritional deprivation; or

(4) Abandonment by the parent, guardian or custodian; or

(5) Inadequate treatment of serious illness or disease; or

(6) Substantial emotional injury inflicted by a parent, guardian or custodian; or

(7) Sale or attempted sale of the child by the parent, guardian or custodian.

W.Va.Code § 49–1–3(e) (Supp.1994).

Both the paternal grandmother and the paternal aunt testified at the March 24, 1994, hearing that they witnessed more than one incident when Renae Ebony, a very young infant, was spanked by her mother. Nancy Forsberg, the DHHR investigator, testified that she was told by Alonzo F. that he had seen the mother shake the baby. Michael Horton, also of DHHR, testified at the March 17, 1994, hearing that Paula W. admitted to him that she had shaken the baby on more than one occasion. None of these adults, including the baby's father, seemed able to afford the child protection.

Counsel for the mother relies heavily on the fact that Renae Ebony bore no visible physical marks or injury discernible to the naked eye from the alleged abuse. What constitutes the imminent danger, however, is the grave potential for serious harm or even death to an infant who is subjected to the type of physical shaking described in this case.[6]

---

**6.** The allegation of the shaking of Renae Ebony is of particular concern as every year thousands of babies suffer blindness, brain damage, or even death from being shaken. A diagnosis of "shaken baby syndrome" may be difficult to make where there is a lack of any external signs. As Jack Showers, Ed.D., notes,

The term 'Shaken Baby Syndrome' (SBS) describes the consequences which occur when a young child's head is whiplashed back and forth during shaking. Babies can be easily injured when shaken. Their neck muscles aren't strong enough to control head movements, and rapid movement of the head can result in the brain being bruised from banging against the skull wall. Bleeding behind the eyes and in and around the brain occurs and can cause serious injury. Depending upon the vulnerability of the child and the severity of the shaking, consequences may include seizures, partial or total blindness, paralysis, mental retardation, or death. In cases of less violent and sometimes chronic shaking of a young child, long-term outcomes can include attention deficits and learning disabilities.

Jack Showers, *Children Today*, p. 34 (vol. 21, no. 2 1992) (footnotes omitted). We further note that the publication, *Children Today*, is regarded as a "well-rounded interdisciplinary journal for the professions serving children" and that it is recognized as being "[v]ery useful for public and academic libraries supporting child-oriented programs and professionals." Bill Katz & Linda Sternberg Katz, *Magazines For Libraries*, p. 224 (5th ed.1986).

Furthermore, records submitted by the Appellant, but not in the record of this case and not considered on the underlying issues of this opinion, reinforce our conclusion as to the danger of shaken baby syndrome. The notation of particular concern is included in a letter to Appellant from Terri L. Farley, a child protective services worker, in which it is stated:

Ebony was taken to FMRS for an Early Intervention evaluation on May 13, 1994, to ascertain if there were any developmental delays. She was very stiff this date in her muscle movements. The more she tried to crawl forward the farther she went backwards. She seemed to be favoring her left side and did little with her right. She was very alert and responded well when assisted with movement by the therapist. She did grasp with her right hand and hold. There was stiffness in her legs, thighs and shoulders. Later evaluation revealed a concern for her jerky motions. The therapist advised the foster parent these motions seemed to be consistent with a 'crack' baby or 'baby shaking' syndrome....

The lower court's conclusion, therefore, that a reasonably available alternative to continuing temporary custody of Renae Ebony in the DHHR existed in the form of a DHHR supervised improvement period in the home is contrary to the evidence in the record. The mother's admitted practice of shaking the infant at issue, together with the inability or unwillingness of the other adults in the home to intervene, created too great a potential for great harm to this child.

\* \* \*

Although we have previously discussed improvement periods in abuse and neglect cases,[7] we have not had occasion to discuss when such improvement periods should include physical custody of the child in-home versus out-of-home. West Virginia Code § 49–6–2(b) (Supp.1994) provides that:

In any proceeding under this article, any parent or custodian may, prior to final hearing, move to be allowed an improvement period of three to twelve months in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. The court shall allow one such improvement period unless it finds compelling circumstances to justify a denial thereof, but *may* require temporary custody with a responsible relative, which may include any parent, guardian, or other custodian, or the state department or other agency during the improvement period. . . .

W.Va.Code § 49–6–2(b) (emphasis added).

In the ordinary abuse and neglect case filed under West Virginia Code § 49–6–1, the court must, upon appropriate motion, allow at least one improvement period unless it finds compelling circumstances to refuse such request. West Virginia Code § 49–6–2(b) leaves within the sound discretion of the trial court the question of whether the child or children who are the subject of the proceeding will remain in the custody of their parents or be placed in the temporary custody of a responsible relative, which may include any parent, guardian, or other custodian, or the state during the term of the court-imposed improvement period. Thus, even in the typical abuse and neglect case where there is no emergency taking, the court has the discretion to impose an out-of-the-home improvement period where custody is granted to a responsible relative or to the state during the temporary removal.

In a case involving an emergency taking, however, the statute requires placement of the child in a safe environment away from the abusing person:

Provided, That where the alleged abusing person, if known, is a member of a household, the court shall not allow placement pursuant to this section of the child or children in said home unless the alleged abusing person is or has been precluded from visiting or residing in said home by judicial order.

W.Va.Code § 49–6–3(a).

■ We therefore conclude that where a child is initially removed from the custody of his or her parents pursuant to West Virginia Code § 49–6–3, and where such emergency taking is subsequently ratified on the basis of a finding of imminent danger, the child shall remain in the temporary legal and physical custody of the state or some responsible relative within the meaning of West Virginia Code § 49–6–3, and out of the alleged abusive home during the improvement period until the circumstances which constitute the imminent danger have ceased to exist, or the alleged abusing person has been precluded from residing in or visiting the home.

For the foregoing reasons, we reverse the lower court's order to the extent that order returns physical custody of Renae Ebony to her parents. We further order that temporary custody of Renae Ebony continue with the DHHR, that both of the child's parents undergo psychological evaluation, and that the parents be granted the three-month improvement period, as previously directed by the circuit court.

We have spoken before about the importance of circuit courts crafting improvement

---

7. *See In re Lacey P.*, 189 W.Va. 580, 433 S.E.2d 518 (1993); *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991); *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991); *State v. Krystal T.*, 185 W.Va. 391, 407 S.E.2d 395 (1991).

periods in a manner designed to remedy the problem that led to the abuse and neglect action. *See Carlita B.,* 185 W.Va. 613, 625, 408 S.E.2d 365, 377. There we stated:

> The goal [of improvement periods and family case plans] should be the development of a program designed to assist the parent(s) in dealing with any problems which interfere with his ability to be an effective parent and to foster an improved relationship between parent and child with an eventual restoration of full parental rights a hoped-for result. The improvement period and family case plans must establish specific measures for the achievement of these goals, as an improvement period must be more than a mere passage of time. It is a period in which the D.H.S. and the court should attempt to facilitate the parent's success, but wherein the parent must understand that he bears a responsibility to demonstrate sufficient progress and improvement to justify return to him of the child.

*Id.* at 625, 408 S.E.2d at 377.

Consistent with our decision in *Carlita B.,* we emphasize in this case that the status of the child and the progress of the parents be monitored on a monthly basis to ensure compliance with the specific goals set forth in the conditions of the improvement period. *Id.* at 625, 408 S.E.2d at 377. We note in this regard that West Virginia Code § 49–6–2(b) allows for a three to twelve month improve-

ment period to remedy the alleged circumstances upon which the abuse and neglect proceeding is based. It would be wise of the circuit judge in drafting the court order imposing the terms and conditions of the improvement period to give himself the flexibility to extend the improvement period past the three month period if progress is being made, but the parents are not fully ready for restoration of custody. We also emphasize the importance of the court offering the parents wide opportunity for continued contact with this infant in crafting the conditions of the improvement period. As was noted in *Carlita B.,* the level of interest a parent demonstrates in visiting his or her child says much about his or her potential to be a good parent. 185 W.Va. at 628, 408 S.E.2d at 380.[8]

Based on the foregoing, this case is reversed and remanded consistent with this opinion.

Reversed and remanded.

BROTHERTON, C.J., did not participate.

MILLER, J., Retired, sitting by temporary assignment.

---

**8.** Although it is not part of the record before us on the issue involved in this case, the guardian ad litem contends in his brief that the mother, and to some extent, the father of Renae Ebony have a poor record with regard to visiting the child once removal was mandated. The circuit court should monitor their level of interest in this child closely in the coming months.