**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **R.W.-1**

**No. 21-0983** (Cabell County 19-JA-252)

**MEMORANDUM DECISION**

Petitioner Father R.W.-2, by counsel Randall D. Wall, and Petitioner Mother D.C., by counsel Jason Goad, appeal the Circuit Court of Cabell County's November 9, 2021, order terminating their parental, guardianship, and custodial rights to R.W.-1.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Ryan Turner, filed a response on the child's behalf in support of the circuit court's order. On appeal, petitioners argue that they were not provided a meaningful improvement period and that the circuit court erred in terminating their parental rights upon insufficient evidence and without imposing a less-restrictive dispositional alternative.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

R.W.-1 was born in February of 2018. At the time of his birth, both parents were minors and involved in youth services and were placed in residential programs. Petitioner D.C. had been

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, as the child and petitioner father share the same initials, we refer to them as R.W.-1 and R.W.-2, respectively, throughout this memorandum decision.

placed in Florence Crittenton[2] on two separate occasions and absconded from that facility to give birth to R.W.-1. Following his birth, R.W.-1 was determined to be drug exposed and suffering from several abnormalities. The child was diagnosed with "parietal encephalocele, feeding difficulties, Dandy Walker Malformation, holoprosencephaly, gray matter heterotopia, and aqueduct stenosis with ventricular rupture," observed to have "recurring seizures," and required a shunt placed in his brain. According to the DHHR, R.W.-1 was treated at the Cincinnati Children's Hospital until April 22, 2018, at which point he was released to D.C.

In May of 2018, the DHHR received a referral that R.W.-1 lost weight while in D.C.'s care and D.C. was not bringing the child to regularly scheduled well checks with a local physician in Cabell County. The DHHR investigated the referral and opened services to assist in R.W.-1's medial needs. The DHHR received another referral in February of 2019, alleging that petitioners continued to miss medical appointments for R.W.-1 and the child was admitted to the hospital for increased seizures. The DHHR found that petitioners presented the child for only two of ten appointments from August of 2018 through March of 2019 and an undetermined number of specialist appointments at the Cincinnati Children's Hospital. The DHHR provided the parents with adult life skills and parenting classes, as well as in-home supervision and safety services and Birth to Three services for R.W.-1. The DHHR also required petitioners to attend random drug screening and required D.C. to participate in mental health services to treat her bipolar disorder.

In October of 2019, the DHHR received another referral alleging that petitioners did not participate in services and continued to miss medical appointments for the child. The DHHR noted difficulty locating petitioners because they changed residences and would not respond to attempted contact from service providers or the child's medical professionals. Finally, in December of 2019, the family was located, and the DHHR took emergency custody of R.W.-1. Upon removing the child, the DHHR discovered that the family had not refilled R.W.-1's seizure medication. The DHHR filed a child abuse and neglect petition, alleging the foregoing, and asserted that petitioners had medically neglected R.W.-1 and failed to provide the child with suitable housing. The circuit court later ratified the emergency removal of the child from petitioners' care.

In February of 2020, petitioners stipulated that they missed medical appointments for the child and had medically neglected him. The circuit court accepted their stipulation and adjudicated them as abusing parents. Petitioners then moved for a post-adjudicatory improvement period, which the circuit court granted. The parties agreed to a family case plan that included the following terms: maintaining a stable home; maintaining employment or stable income; attending medical appointments for R.W.-1; completing parenting and adult life skills classes; random drug screening; and completing a parental fitness evaluation and following the recommendations of the evaluator.

---

[2]According to the record, Florence Crittenton is a residential program for pregnant and post-partum mothers.

The circuit court held a review hearing in May of 2020 and found that the parents were "making some efforts toward their case plans." The court also found that due to the pandemic, the child's medical care required a transfer from Cincinnati Children's Hospital to Morgantown, West Virginia, and it approved the transfer. The circuit court also noted that petitioners' forensic evaluations were pending.

Petitioners' parental fitness evaluations were completed in December of 2020. D.C.'s evaluator found that D.C. exhibited symptoms of depression, anxiety, trauma, difficulty thinking, and problematic personality traits (such as "cold and unfeeling; harsh and punitive, and distant in interpersonal relationships"). Additionally, D.C. had been previously diagnosed with bipolar disorder and attention deficit hyperactivity disorder. D.C. admitted to past suicidal ideation and anger problems, but she did not express a strong desire for treatment. The evaluator stated that D.C.'s cognitive assessment indicated she was "impaired" and in the "low to very low range" of cognitive ability. The evaluator concluded that D.C.'s prognosis for reliable attainment of minimally adequate parenting was poor. The evaluator recommended that D.C. participate in psychotherapy to treat her diagnosis.

R.W.-2's evaluator opined that R.W.-2 had the cognitive ability to parent a child and maintain a household, but she believed he lacked insight and did not hold realistic plans for the future. R.W.-2 denied substance abuse issues but admitted that he intended to use heroin and Xanax on his birthday. The evaluator noted that R.W.-2 was arrested in April of 2020 when he was found in possession of heroin and Xanax. The evaluator suggested that R.W.-2 stated that the substances were for personal use in order to "save face in light of his pending charges," as he possessed a "large amount of heroin for a new user." The evaluator also reported that R.W.-2 "did not take personal responsibility for his [Child Protective Services] involvement and was dismissive of [the DHHR's] concerns." Finally, the evaluator opined that R.W.-2 had a "guarded to poor" prognosis for achieving minimally adequate parenting.

The record provides that the circuit court held another review hearing in May of 2021. At the hearing, the DHHR recommended termination of petitioners' parental rights to the child. The parents argued for additional time, stating that the foster parents were able to learn how to care for R.W.-1's special needs and that they could also learn. Notably, R.W.-2 was on probation for his criminal charges and therefore was not incarcerated at the time of this hearing. The guardian recommended terminating the parents' parental rights. The guardian stated that the foster parents created a "Day in the Life" video that depicted R.W.-1's daily required care. The guardian explained that he had doubts the parents would be able to effectively care for the child due to the severity of his medical conditions, which required "twenty-four hours a day, seven days a week" care. The court ordered a multidisciplinary team ("MDT") meeting be held and that the parties be provided the "Day in the Life" video.

The circuit court held dispositional hearings in August and September of 2021, and issued a final dispositional order in November of 2021, detailing the testimony provided from the parents and a DHHR worker. In its order, the circuit court recounted R.W.-1's medical diagnoses, which, in addition to those set forth above, included that the child required a "G-tube placed for feeding" and "other serious medical interventions to keep him alive." Testimony showed that the child had been in specialized foster care since February of 2020, with foster parents who had prior medical training and were retired, providing them an opportunity to care

3

for the child twenty-four hours per day. At age three, R.W.-1 was unable to walk, roll, crawl, or speak. The child could not be left alone and could not be taken outside due to his medical conditions. Evidence showed that R.W.-1 required a "sterile and clean" environment, that caregivers could not leave the home and then interact with R.W.-1 and that visitors "must be totally clean."

During their testimony, petitioners asserted that they were not provided a chance to demonstrate an ability to care for R.W.-1. Due to COVID-19 precautions, the parents were not permitted to attend R.W.-1's medical appointments or any in-person visitation with the child. D.C. testified that she received some medical training during the proceedings and was employed as a licensed certified nursing assistant for nine-and-one-half months. She explained that her license was no longer valid after she left that employment. D.C. also stated that she never failed to transport R.W.-1 to "important medical appointments" and had only missed "scheduled check-ups" for the child. Both petitioners asserted that they would move to Ohio to be closer to specialized care for R.W.-1. D.C. testified that she did not watch the "Day in the Life" video that the foster parents created, but R.W.-2 testified that he had.

The DHHR worker testified that R.W.-2 was "minimally compliant" with portions of his case plan, such as parenting and adult life skills classes, but was noncompliant with random drug screening. The worker further testified that R.W.-2 had only "sporadically participated" in video visitation with the child, stating "many times" that he was too sick to answer the phone. The worker also testified that R.W.-2 did not have independent housing. Regarding D.C., the worker testified that she was minimally compliant with her improvement period. She agreed that D.C. demonstrated improvement in the last few months; the court found "however, throughout the entirety of the case, her behavior ha[d] been so erratic that [Child Protective Services] was not able to work with her on skills to regain her child." Additionally, D.C. completed ten drug screens throughout the proceedings, which were positive for marijuana, "missed many [other] drug screens," and she had not submitted a drug screen sample since May of 2021. The DHHR worker opined that, although D.C. addressed her mental health issues close in time to the dispositional hearing, she needed "more stability and consistency regarding employment, housing, and marijuana use." The worker also testified that petitioners had an active Child Protective Services case for twenty-two months prior to the filing of the instant petition, and neither parent was compliant with services during that time.

The DHHR worker opined that petitioners "still do not seem to understand why this case was brought against them [which was the parents'] refusal to see and properly address the [medical] issues" of R.W.-1. She explained that the DHHR experienced significant barriers in educating the parents due to D.C.'s uncooperative, "erratic and out of control" attitude early in the proceedings and R.W.-2's criminal charges. Even as recently as the July of 2021 MDT meeting, D.C. had an inappropriate outburst of emotions directed at the MDT members. The worker further explained that, while the DHHR does not provide medical training to parents, if petitioners had complied with their case plans, then "transitional home care would have been provided to put [R.W.-1] back in their home, which would include necessary medical assistance."

4

Ultimately, the court found that petitioners had been "dismissive, argumentative, and inconsistent" during the proceedings. The court found that petitioners failed to follow the recommendations of the family case plans and the parental fitness evaluations and demonstrated a "general lack of cooperation with the [DHHR]." The court considered that D.C. had made "some recent improvements in behavior," but, relying on D.C.'s parental fitness evaluation, found that the "concerns regarding competency to support and care for [R.W.-1] would have been insurmountable hinderances to reunification." Regarding R.W.-2, the court noted that he had been arrested and charged with possession of a controlled substance, possession with intent to deliver, and carrying a concealed weapon. R.W.-2 entered into "a deferred adjudication agreement" for his criminal charges, but he had violated the terms by committing further criminal acts, which again involved controlled substances. The circuit court found that R.W.-2 was incarcerated pending sentencing for the first set of criminal acts. The court considered that even if R.W.-2 was not incarcerated, his "issues of anger management and competency to support and care for [R.W.-1] would have likewise been insurmountable hindrances to reunification." Finally, the court concluded that there was no reasonable likelihood that the conditions of neglect and abuse could be substantially corrected in the near future and that it was necessary for the welfare of the child to terminate petitioners' parental, guardianship, and custodial rights. The circuit court memorialized its decision by its November 9, 2021, order, which petitioners now appeal.[3]

The Court has previously held:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioners argue that they were not provided a meaningful opportunity to prove that they could care for their infant son. In petitioners' view, the "conditions giving rise to the filing of the petition was the parents['] age and lack of resources and things 'beyond their

---

[3]According to the parties, the permanency plan for the child is adoption in his current foster placement.

control.'" Petitioners acknowledge that they needed an opportunity to show they could care for R.W.-1 but argue that the DHHR's "cookie cutter" case plan was not tailored to the conditions of neglect. According to petitioners, the family case plan provided the common services of abuse and neglect cases, such as parenting classes, supervised visitation, and random drug screening, but did not address issues with transportation or instruction on how to care for medically fragile R.W.-1. In sum, petitioners argue that they were not provided an opportunity to care for R.W.-1.

This Court has held that "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014). Further, petitioners were provided the maximum period of time allowed by statute to improve, which must be considered in this Court's analysis. At the time of the dispositional hearing, the record provides that the child was in specialized foster care from December of 2019 through September of 2021, which was when the final dispositional hearing was held. West Virginia Code § 49-4-610(9) provides that

> no combination of any improvement periods or extensions thereto may cause a child to be in foster care more than fifteen months of the most recent twenty-two months, unless the court finds compelling circumstances by clear and convincing evidence that it is in the child's best interests to extend the time limits contained in this paragraph.

This time limit was exceeded in March of 2021, and petitioners received the benefit of five additional months to demonstrate improvement. Indeed, this Court has directed that

> [a]lthough it is sometimes a difficult task, the trial court must accept the fact that the statutory limits on improvement periods (as well as our case law limiting the right to improvement periods) dictate that there comes a time for decision, because a child deserves resolution and permanency in his or her life, and because part of that permanency must include at minimum a right to rely on his or her caretakers to be there to provide the basic nurturance of life.

*State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 260, 470 S.E.2d 205, 214 (1996).

Here, it is clear from the record that petitioners were not amenable to instruction from the DHHR due to their individual barriers. While they argue that the DHHR did not provide them an opportunity to care for the child, they do not acknowledge on appeal that they were only minimally compliant with the other conditions of their extensive improvement periods. Neither parent drug screened consistently throughout the proceedings, despite admitting to the use of controlled substances. The circuit court found that petitioners were generally uncooperative with the DHHR and the services that the agency offered, even before the instant petition was filed. An improvement period is "a period in which the [DHHR] and the court should attempt to facilitate the parent's success, but wherein *the parent must understand that he [or she] bears a responsibility to demonstrate sufficient progress and improvement to justify return to him [or her] of the child.*" *In re Renae Ebony W.*, 192 W. Va. 421, 427, 452 S.E.2d 737, 743 (1994)

6

(citation omitted) (emphasis added). While we recognize that petitioners were not able to attend the medical appointments for the child due to COVID-19, a circumstance that was out of their control, it is also clear from the record that petitioners did not otherwise demonstrate a level of stability and cooperation with the DHHR that could justify returning R.W.-1, who is incredibly medically fragile, to their care. According to the DHHR worker's testimony, the DHHR could have provided necessary training to petitioners with the transition of R.W.-1 into their care. Yet, petitioners failed to demonstrate overall compliance with the case plan, such that reunification could not be considered. R.W.-2 was incarcerated during the proceedings due to his own criminal actions and could not care for the child as of the dispositional hearing. D.C. demonstrated explosive outbursts as recently as July of 2021 and admitted that she had not viewed the "Day in the Life" video that depicted the care R.W.-1 required. Simply put, petitioners' noncompliance was such that the DHHR did not have an opportunity to provide hands on instruction in the care of the child until late in the proceedings. While D.C. made some improvement in her cooperation near the end of the proceedings, the circuit court was statutorily required to determine permanency for the child, and the evidence showed that neither parent was prepared to care for R.W.-1. Accordingly, we find no error in the circuit court's decision not to grant petitioners additional time to improve.

Petitioners also argue that the circuit court erred in finding that there was no reasonable likelihood that the conditions of neglect or abuse could be substantially corrected in the near future. According to petitioners, the DHHR failed to present evidence that fits one of the six circumstances presented in West Virginia Code § 49-4-604(d). Petitioners assert that the evidence below demonstrated that there was a reasonable likelihood that the conditions of neglect and abuse could be substantially corrected and emphasize the DHHR worker's testimony "that she had no evidence that [petitioners] could not learn the skills to take care" of R.W.-1.

Pursuant to West Virginia Code § 49-4-604(c)(6), a circuit court may terminate a parent's parental, guardianship, and custodial rights upon finding that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the welfare of the child. Contrary to petitioners' argument, there was significant evidence presented related to one of the circumstances, found in West Virginia Code § 49-4-604(d)(3), which provides that there is no reasonable likelihood that the conditions of neglect and abuse can be substantially corrected when

> [t]he . . . parents have not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health, or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare, or life of the child.

As set forth above, petitioners failed to fully participate in their family case plans. The circuit court found that they were generally not cooperative with the DHHR, and the evidence shows that they only "minimally complied" with their case plan. Neither parent complied with random drug screenings, and both tested positive for controlled substances throughout the proceedings. R.W.-2's progress was substantially blocked by his recurring criminal acts, and

D.C. demonstrated emotional instability throughout the proceedings. Critically, we have held that

> "[c]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements." Syl. Pt. 1, in part, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980).

*Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 4. It is difficult to conceive of a child more susceptible to illness and requiring more consistent and close interaction than R.W.-1. While over the age of three, the court heard evidence that R.W.-1 was completely dependent on his caregivers and his welfare could be seriously threatened by a lapse in attention from those caregivers. After extensive proceedings, both prior to and subsequent to the filing of the child abuse and neglect petition, the circuit court remained concerned that petitioners did not have the competency to support or care for R.W.-1. Upon our review, we find no error in the circuit court's determination that there was no reasonable likelihood that petitioners could correct the conditions of neglect and abuse in the near future.

Finally, petitioners argue that the circuit court erred in terminating their parental rights rather than imposing a less-restrictive dispositional alternative. However, having held that the circuit court did not err in finding that there was no reasonable likelihood that the conditions of neglect and abuse could be substantially corrected in the near future, the circuit court did not abuse its discretion in terminating their parental rights. This Court has held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Accordingly, we find no error in the circuit court's final disposition. Petitioners are entitled to no relief on appeal.

For the foregoing reasons, we find no error in the decision of the circuit court, and its November 9, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: May 12, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn