452 S.E.2d 454

**In re BRIANNA ELIZABETH M.,
Krista M., and Lonnie M., Jr.**

**No. 22299.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 1994.

Decided Dec. 8, 1994.

Michelle L. Rusen, Pros. Atty. of Wood County, Parkersburg, for W.Va. Dept. of Health and Human Services.

Ralph E. Troisi, Waverly, for Children.

George E. Lantz, Lantz & Tebay, Parkersburg, for Lonnie M.

Susan Simmons, Elizabeth, for Carol M.

PER CURIAM:

This Petition on behalf of three minor children requests reversal of an August 14, 1992, order of the Circuit Court of Wood County granting Lonnie M., the father of the children (hereinafter "the father" or "Lonnie"), an improvement period.[1] The petition further requests reversal of an October 18, 1993, order awarding custody of the two surviving children to the West Virginia Department of Health and Human Resources (hereinafter "DHHR") but refusing to terminate the parental rights of the father. We find that the lower court erred in failing to terminate the parental rights of the father, and we order such termination and the continued legal custody of the two surviving children in DHHR.

## I.

On January 24, 1992, Connie Jones, a DHHR Protective Services worker, filed a petition in the lower court seeking an adjudication that seven-year-old Krista M., two-year-old Lonnie M., and two-month-old Brianna Elizabeth M. had been neglected and/or abused. Specifically, DHHR alleged that one or both parents, Carol and Lonnie M., had, on January 1, 1992, intentionally inflicted physical abuse or had knowingly allowed such abuse to be inflicted upon their two-month-old daughter, Brianna. DHHR further requested termination of the parental rights of both parents.[2] Brianna was taken to St. Joseph's Hospital in Parkersburg, West Virginia, in the early morning hours of January 1, 1992. She vomited repeatedly, was unresponsive, and was apparently suffering from seizures. A CAT scan revealed that

---

**1.** We continue our longstanding tradition of referencing the parties only by their first names to protect the anonymity of the children. *See In re Scottie D.,* 185 W.Va. 191, 406 S.E.2d 214 (1991).

**2.** The other two children, Krista and Lonnie, were alleged to have been abused and neglected by virtue of residing in the home where such abuse of Brianna had occurred.

the seizures resulted from hematomas located in the front and back of her brain. These injuries were described by her pediatricians as subdural effusions, including a large area of cerebral atrophy in the midbrain. By the evening of January 1, 1992, Brianna began suffering tremors of the arms and legs. On January 2, 1992, three fractures of Brianna's ribs were discovered, and child abuse was thereafter diagnosed.[3] Based upon the CAT scan, chest x-rays, and other analyses, it was determined that at least two incidents of aggravated child abuse had occurred. Brianna was transferred to the Intensive Care Unit of Children's Hospital in Columbus, Ohio, on January 2, 1992. Pediatricians treating her at that facility explored all possible causes of the head and rib injuries and also concluded that Brianna was the victim of child abuse. The pediatricians further concluded that two or more separate incidents of abuse had occurred and that Brianna had suffered permanent brain damage.[4] After reviewing the January 1992 petition, the lower court immediately removed all three children from their parents and placed them in the legal custody of DHHR, and in the physical custody of their paternal grandparents.[5] Subsequent to several adjudicatory hearings held on various dates from January through June 1992, the lower court determined that abuse upon Brianna had been committed by the mother and that both parents had committed neglect. Throughout the proceedings, the parents offered no plausible explanation for Brianna's injuries. They suggested such causes as a defective baby swing and botu-lism; however, no proof of any of these allegations was offered.

Lonnie consistently and repeatedly maintained that he had never seen his wife harm the children or verbally abuse them. Acquaintances of the parents, however, testified that they had witnessed Carol's physical and verbal abuse of her children. Janet Watson, a friend of the family, testified that she had witnessed an incident during which the mother "really lost it" and repeatedly struck the older daughter until Ms. Watson intervened. Ms. Watson also indicated that Carol had called Krista a "bitch" on at least one occasion. Carol had also apparently telephoned her mother when Krista was an infant to request her mother to take Krista because Lonnie had allegedly attempted to smother the child.

Linda Sandel, the counselor for the parents, testified that Carol suffered a personality disorder with passive/aggressive and paranoid tendencies.[6] Ms. Sandel also testified that Lonnie had described Carol's cycles of high energy and agitated states in which she verbally abused her husband and children. Ms. Sandel further testified that Lonnie employed repression and denial to deal with psychological conflicts and had not yet acknowledged that his wife had perpetrated the abuse.

The lower court, by order dated August 14, 1992, terminated the parental rights of the mother, from which she has not sought an appeal, but granted Lonnie a one-year improvement period based upon his alleged intention to divorce Carol.[7] Lonnie separated

---

3. Pediatricians treating Brianna testified that rib fractures in a six-week-old infant were extraordinary, since the flexibility of a newborn's bones make the bones very difficult to fracture.

4. The pediatricians explored such possible causes of Brianna's injuries as a serious automobile accident, serious fall, or intentional abuse. They determined that the rib fractures were of recent origin, within five days prior to the examination. They also estimated that the head injuries had occurred on two separate occasions, based upon bleeding which appeared to have originated within 72 hours of the CAT scan and older bleeding which originated two to six weeks prior to the CAT scan.

5. Krista and Lonnie continue to reside with their paternal grandparents.

6. Carol was hospitalized in January 1992, after suffering a mental breakdown.

7. During this August 14, 1992, dispositional hearing, DHHR requested termination of the mother's parental rights, but asked that the father be granted a one-year improvement period. The lower court noted that the father supported and colluded with the mother in defending both of them against charges of abuse. The court also recognized that the father had not yet admitted that the mother had perpetrated the abuse. Moreover, the attorney for the children requested immediate and permanent termination of parental rights of *both* parents. The lower court followed the recommendations of the DHHS, however, terminating the parental rights of the mother and granting the father a one-year improvement period.

from his wife and resided in a camper behind his parents' home subsequent to the August 1992 order, and the children resided with Lonnie's parents. Brianna died on May 4, 1993, due to complications resulting from the original head injuries.

In August 1993, the Petitioner, by the Prosecuting Attorney of Wood County, sought to terminate the father's improvement period based upon his alleged consent to contact between the children and their mother.[8] Lonnie and Carol had still not finalized a divorce, and Carol resided in a home which had previously been the marital home within two blocks of the children's residence.

By the October 18, 1993, final dispositional hearing, Lonnie and Carol had obtained a divorce. DHHR worker Jane Dodd expressed concern at the hearing that Lonnie had not satisfied the conditions of his improvement period and explained that he had failed, in the fourteen months since his improvement period was granted, to complete "some of the crucial things that needed to be done to ensure that ... [his] children will be safe." He had not, for instance, yet severed all ties with Carol, and he continued to permit her to remain in their marital home only a few blocks from the children. Ms. Dodd also emphasized that "most importantly, Mr. M. has not once expressed that he knows Brianna's injuries were caused by his wife. It does not appear that Mr. M. realizes the seriousness of what has occurred to his children."[9]

The Petition presently before us seeks termination of Lonnie's parental rights and continued legal custody in the DHHR. DHHR joins in this appeal and also seeks termination of the parental rights of the father.

II.

■ In syllabus point 4 of *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989), we explained the following:

'Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W.Va.Code*, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W.Va.Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

■ Syllabus point 2 of *In re Jeffrey R. L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993) further elaborates on that issue, as follows:

'W.Va.Code, ·49–1–3(a) (1984), in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent.' Syl. pt. 3, *In re Betty J. W.*, 179 W.Va. 605, 371 S.E.2d 326 (1988).

This Court also explained in syllabus point 3 of *Jeffrey R. L.* that when the perpetrator of

8. Carol was not permitted to see the children after the termination of her parental rights, and Lonnie was required, as part of his improvement period, to prevent the children from having contact with their mother. The Motion to Revoke Improvement Period filed with the lower court alleges that the "respondent-father has allowed Carol [M.] to have contact with Lonnie and Krista [M.]." The petition also alleges that the parents "spend a great deal of time together" indicating the father's "refusal to comply with the spirit of the Court's Order." Testimony was elicited at an August 1993 hearing from a neighbor who had witnessed Carol returning Lonnie and Krista home to their grandparents' home from an outing. Another witness testified that he played in a band with Lonnie and had seen the children with their mother.

9. The requirements of Lonnie's improvement period included attendance at all sessions of one series of parenting classes, initiation of individual therapy, and preparation of a written report describing what, in hindsight, he could have done to prevent the removal of his children from him and his wife. He discontinued therapy shortly after it was initiated and failed to acknowledge that his children were removed because of the serious injuries inflicted upon Brianna. Lonnie was also required to take Krista for individual therapy and to engage the children in family therapy. He discontinued Krista's therapy and failed to attend family therapy.

child abuse has not been absolutely identified and when the caretaker offers no explanation, those factors alone may justify termination of parental rights. Syllabus point 3 states:

> Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.

190 W.Va. at 25–26, 435 S.E.2d at 163–64.

■ In syllabus point 2 of *In re Scottie D.*, we developed our rationale for termination of parental rights of a parent who did not actually participate in the abuse, as follows:

> Termination of parental rights of a parent of an abused child is authorized under *W.Va.Code*, 49–6–1 to 49–6–10, as amended, where such parent contends nonparticipation in the acts giving rise to the termination petition but there is clear and convincing evidence that such nonparticipating parent knowingly took no action to prevent or stop such acts to protect the child. Furthermore, termination of parental rights of a parent of an abused child is authorized under *W.Va.Code*, 49–6–1 to 49–6–10, as amended, where such nonparticipating parent supports the other parent's version as to how a child's injuries occurred, but there is clear and convincing evidence that such version is inconsistent with the medical evidence.

185 W.Va. at 192, 406 S.E.2d at 215. As we noted in *In re Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985), "it is ludicrous for [the nonparticipating father] to assert that he should be held blameless for his nonaction in protecting his child." *Id.* at 141, 331 S.E.2d at 873.

■ In the present case, the lower court granted the father an improvement period despite the absence of any acknowledgment of the abuse. The father insisted that he did not know how such horrendous injuries had been inflicted, and he repeatedly refused to acknowledge that his wife could be the abuser even in the fact of overwhelming medical evidence of extreme child abuse. As in the present case, the father in *In re Scottie D.* did not directly participate in the abuse. Yet we noted in that case that "[a]lthough the appellee's version does not *expressly* support his wife's account, it is nonetheless *supportive,* and, importantly, inconsistent with the medical evidence presented." 185 W.Va. at 196, 406 S.E.2d at 219 (emphasis in original).

Further, in the present case, Lonnie permitted the children's mother to maintain unsupervised contact with them subsequent to the termination of her parental rights. This inability or unwillingness to prevent his former wife from having contact with the children evidences a disregard for the orders of the lower court and for the safety of his two surviving children.

Lonnie could conceivably have been unaware of the extent of his wife's abusive behavior prior to Brianna's injuries. The lower court conveyed the benefit of any doubt in that regard upon Lonnie when it granted him an improvement period rather than simply terminating his parental rights when Carol's rights were terminated. Yet Lonnie still maintained contact with his wife, permitted her to have contact with the children, and failed to acknowledge that his wife had inflicted serious injuries upon his daughter which ultimately caused Brianna's death.

Although sound public policy and the whole tenor of law seek generally to perpetuate the marital bond, the rights of children to be free from abuse require that a parent's first loyalty be to the protection of his or her children.

Upon thorough evaluation of this case, we reverse the decision of the lower court and remand this matter for an order terminating the parental rights of Lonnie M. to his surviving children. Pursuant to the recommendations of DHHR, however, it appears that supervised visitation [10] between Lonnie M.

---

10. On remand, the circuit court should consider the nature of the supervision, and determine whether the grandparents will be able to offer the necessary supervision and protection.

and his children may be in their best interest at this time. The children should remain in the legal custody of DHHR and in the physical custody of their paternal grandparents, with whom the evidence shows they have an emotional bond, as long as such custody arrangements prove beneficial to the best interests of the children. There remains some concern whether the paternal grandparents will be able to offer these children the protection and security they have not had from either parent. Thus, these children should be monitored closely by the DHHR over the ensuing months, and the circuit court should hold frequent reviews to determine whether such protection is being accorded and whether this placement is in the children's best interest. As part of these reviews, the court should also examine whether any additional services to the children or the grandparents are needed to facilitate their success. If the paternal grandparents become unwilling or unable to care for the children or to protect their interests, the DHHR should return to court to seek alternative permanent placement.

All children deserve the resolution in their lives of a permanent placement. Consequently, the court should hold a plenary review of this case in one year, and should determine at that time whether the grandparents have acted in such a manner that would justify placing the children in their permanent custody; and if they have done so, the court should make such permanent placement.[11] If the paternal grandparents become unwilling or unable to care for the children or to protect their interests, the DHHR should return to court to seek alternative permanent placement.

Reversed and remanded.

BROTHERTON, C.J., did not participate.

MILLER, J. (Retired), sitting by temporary assignment.

11. The court may include within such final order the right of permanent visitation in the father if he has acted in such a manner as to justify it.