475 S.E.2d 865

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, ex rel. Brenda WRIGHT, Social Service Worker, Plaintiff Below, Appellee,

v.

DORIS S. and Rosalee S., Defendants Below, Appellants.

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES ex rel. Brenda WRIGHT, Social Service Worker, Plaintiff Below, Appellee,

v.

MELISSA C., Brian "S." C., Larry "M." C., Joseph E., David E., and any known and unknown Putative Father or Fathers of the Infant Children, Brian "S." C. and Larry "M." C., Defendants Below, David E., Appellant.

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES ex rel. Brenda WRIGHT, Social Service Worker, Plaintiff Below, Appellee,

v.

DORIS S. and Rosalee S., Defendants Below, Appellants.

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES ex rel. Brenda WRIGHT, Social Service Worker, Plaintiff Below, Appellee,

v.

MELISSA C., Brian "S." C., Larry "M." C., Joseph E., John E., David E., and Any

---

Known and Unknown Putative Father or Fathers of the Infant Children, Brian "S." C. and Larry "M." C., Defendants Below, Melissa C. and Doris S., Appellants.

Nos. 23156, 23157.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 23, 1996.

Decided July 8, 1996.

Barbara L. Baxter, Assistant Attorney General, Charleston, for Appellee West Virginia Department of Health and Human Resources.

Jerry Blair, Huntington, for Appellants Doris S. and Melissa C.

Lisa Fredeking White, Guardian Ad Litem, Huntington, for Brian "S." C., Larry "M." C., Joseph E., John E., and Rosalee S.

Dwight J. Staples, Henderson, Henderson & Staples, Huntington, for David E.

Scott Tyree, Huntington, for Mark S.

Richard L. Vital, Huntington, for Paternal Grandparents, Brando & Monroe M., of B.S.C. & L.M.C.

R. Lee Booten, Huntington, for Polly Jean D.

WORKMAN, Justice:

This case is before the Court upon the consolidated appeal [1] of Melissa C., Doris S.[2] and David E.[3] from the February 10, 1995, final order of the Circuit Court of Cabell County, which resulted in the termination of the following parental rights: Doris S.'s parental rights to her minor child, Rosalee S., five years old; Melissa C.'s parental rights to her minor children, Brian "Scott" C., seven years old, Larry "Mike" C., five years old, Joseph E., four years old, and John E, three years old; and, David E.'s parental rights to his minor children, Joseph E. and John E. The Appellant, David E., argues that the lower court erred in terminating his parental rights where the Appellee failed to present clear and convincing evidence that there was no reasonable likelihood that conditions of neglect or abuse could be substantially corrected and where the trial court denied him a meaningful improvement period. The Appellants, Doris S. and Melissa C., argue that the lower court erred and abused its discretion by denying them a meaningful improvement period without clear and convincing evidence of compelling circumstances that would justify such a denial and by terminating their parental rights where the State failed to satisfy its burden of clear and convincing evidence, especially with regard to Melissa C. Based on a review of the record, the parties' briefs and arguments, the guardian ad litem's brief, and all other matters submitted before the Court, we conclude that the circuit court committed no error and, accordingly, affirm.

I.

Detective Jim Scheidler of the Cabell County Sheriff's Department testified that on the morning of April 19, 1993, he responded to a call at 4105 Green Valley Road in Huntington, West Virginia, regarding the death of Allen Ray S., Appellant Doris S.'s twenty-two-month-old son. Detective Scheidler indicated that upon his arrival to the residence, he first noticed the infant's body in the back of an ambulance. The officer testified that the child's body felt cool when he touched it and that the child's clothing was wet or damp in spots. Appellant Melissa C. told the detective that she had discovered the child face down on the couch on which he slept. The officer stated that it was his opinion that the child had been dead for "five to ten hours or more[,]" at the time of his arrival upon the scene.[4] The detective learned that in addition to the children, Rosalee S., Scott C., Mike C., Joseph E. and John E., the following adults had been present through the evening preceding the child's death: David E.,[5] Melissa C., Larry C.,[6] Dor-

1. A joint appeal was filed by Melissa C. and Doris S., while David E. filed a separate appeal. We consolidated the appeals because the termination of parental rights arose out of the same facts.

2. Melissa C. and Doris S. are sisters who are represented by the same counsel and raise the same errors on appeal.

3. David E. is married to Appellant Melissa C.

4. David E.'s attorney elicited this opinion during his cross-examination of the officer. There were no objections raised as to the officer's expertise in rendering such an opinion.

5. The information given to the detective revealed that David E. and his children stayed in a separate bedroom in the dwelling. Moreover, the detective testified that he observed no physical injuries with regard to David E.'s children.

6. According to Detective Scheidler's testimony, Larry C. (also referred to in the transcript as Larry D. and Larry S.) is Melissa's and Doris's brother. The guardian ad litem indicated in her brief that according to Detective Scheidler's notes, which are not a part of the record on appeal, Larry C. slept on the couch with Allen Ray, the deceased child. Further, the guardian ad litem stated that "[t]he adults in the home first reported that Larry C. must have rolled over on the infant during the night causing the child to suffocate." No evidence concerning Larry C.'s involvement in the child's death was presented before the trial court, other than the fact that he gave Detective Scheidler a signed statement.

is S, and James Nance, Doris S.'s boyfriend.[7] Detective Scheidler also testified that "[i]n talking to Melissa and all of those at the scene that day, they all indicated to me, to their recollection, that there was never any violent injury or anything of a violent nature that was done to Allen Ray." Moreover, the detective indicated that at no time after he left the scene did he receive any information about the child's death from any of the adults present in the home the night the child died. Finally, the detective testified that he made the decision to call the Department of Health and Human Resources ("DHHR") concerning the other children after he entered the residence and observed "[v]ery unsanitary" living conditions,[8] including mice in the garbage.[9]

Dr. Irvin Sopher, Chief Medical Examiner for the State of West Virginia performed an autopsy on the deceased child. The autopsy results revealed that there were "no external evidence of significant trauma, either old or recent." Further, x-rays did not reveal any old or new bone fractures. The doctor's examination, however, indicated that the child sustained a "severe injury to the spinal column ... which resulted in a severe hemorrhage surrounding the spinal cord[,]" the length of which was approximately fifteen inches long. Dr. Sopher testified that "[t]his is a finding which we rather clasically [sic] see in a condition called shaken baby syndrome[,]" and that "there was severe injury to ... [the child's] body in the form of vertebral column trauma as by shaking, violent shaking, which ... is the cause of death in this particular infant." The doctor further testified that the onset of blood coming from the child's nostril, as depicted in a photograph taken of the deceased, was "[p]robably immediate." The doctor also stated that "it's hard to imagine in any kind of an accidental setting in a household environment, in other words, where there aren't velocities of motor vehicles or aircraft involved, that you could

As we recently noted in *Powderidge Unit Owners Association v. Highland Properties, Ltd.*, 196 W.Va. 692, 474 S.E.2d 872 (1996), evidence not submitted before the trial court may not be considered by this Court on appeal. *Id.* at 703, 474 S.E.2d at 883 n. 16; *accord O'Neal v. Peake Operating Co.*, 185 W.Va. 28, 32, 404 S.E.2d 420, 424 (1991) (stating that "[t]his court may only properly consider those issues which appear in the record before us"). Accordingly, it is the parties' duty to make sure that evidence relevant to a judicial determination be placed in the record before the lower court so that we may properly consider it on appeal. Unfortunately, as an aside, in cases involving abuse and neglect, we are with increasing frequency seeing records wherein the court and attorneys involved failed to observe sufficient formality in building a record. It would behoove the attorneys who undertake representation in abuse and neglect proceedings to be meticulous in presenting evidence and building an adequate record before the lower court documenting their respective cases.

7. James Nance was arrested and charged with Allen Ray's murder; however, he was released from custody after a no probable cause determination was made at the preliminary hearing. Mr. Nance was not the father of any of the subject children; however, the Appellant, Doris S., did give birth to Mr. Nance's child subsequent to the lower court's termination of her parental rights. According to Doris S.'s brief, the Department of Health and Human Resources ("DHHR") has instructed her not to let Mr.

Nance have any contact with the infant or they will seek custody of the child.

8. All of the Appellants entered into stipulations reflected in two separate court orders dated May 27, 1993, that the "house in which the said infant children were residing at the time of the filing of this petition was filthy, and inadequate in plumbing and furnishings to provide for young children." The court-appointed special advocate report dated July 7, 1993, described this filth further as "feces, garbage and maggots." Finally the petition filed in 93-J-267 stated that there are "no bathroom facilities ... and there are maggets (sic) and rats in one room."

Furthermore, Detective Scheidler testified that [a]s you enter the front door, immediately straight ahead is a sofa.... To the left of that was a bedroom with a single bed in it, and to the left of that as you enter is an extra ... bedroom, but it was filled with garbage and trash that was three, four foot in depth. Again, as you enter the front door, to the right is the kitchen. Then through the kitchen is another bedroom on the extreme end of the house.

9. An emergency hearing was held on April 20, 1993, with Melissa C. and David E. present. The court, based on a finding of imminent danger to the children, placed legal and physical custody of the children with the DHHR. Likewise, by order entered April 23, 1993, Doris S. stipulated that there was imminent danger to the children and allowed temporary legal and physical custody of her child to be placed with the DHHR.

have this extensive of an injury without an abusive situation." Finally, Dr. Sopher estimated the time of death at 10:00 p.m. on April 18, 1993, based on the child's stomach contents and the doctor's assumption that the child last ate at 7:00 p.m. prior to his death; however, he also indicated that while the child probably only lived minutes after the infliction of the injury, it was possible that there could have been a delay of several hours from the shaking until the time the child died.

Gary McMullen, a DHHR child protective service worker, testified that Phyllis Justice, the aunt with whom Rosalee was placed after her removal from her mother's custody, contacted him regarding nightmares that Rosalee was having. Mr. McMullen stated that he interviewed the child in order to ascertain what type of services would be available for her. Mr. McMullen indicated that when he spoke with five-year-old Rosalee about the events surrounding Allen Ray's death, she became very anxious and nervous. Mr. McMullen testified that through the use of drawing, Rosalee told him that

> she was playing by the creek, along with Scotty and Mikey, and that Melissa C[ ][.] was there and some others, and she said that Allen went into the creek and got wet and that Jimmy Nance became very upset,

and as a result, she went with Jimmy Nance and with Allen Ray into the house into one of the bedrooms, and it was at that time that ... Jimmy Nance started shaking Allen Ray and that his nose started bleeding and that ... [s]he said, 'well, he quit moving[,]' ... [and] 'started turning blue.' She said ... that Jimmy told her not to say anything about it and they left the room at that time, 'they' being Jimmy Nance and Allen Ray.... Through the conversation, I asked her if she had discussed this with anyone else. And she said that ... her mother visited the home and—had a visit with her and that she did disclose to her mother about the nightmares, and she said that her mother told her not to say anything about the nightmares, and that was basically it.[10]

According to Mr. McMullen's testimony, Rosalee also told him that she was afraid of Jimmy Nance.[11] Finally, in response to inquiry by David E.'s counsel, Mr. McMullen testified that Rosalee never indicated to him that David E. ·was present during these events.

None of the children who were removed from the home testified at the termination proceeding; however, the lower court, without the Appellants' objection,[12] admitted statements that Mike C. and Rosalee S.[13]

---

10. Phyllis Justice, Rosalee's aunt, also testified that Rosalee told her that "Mommy had told her [Rosalee] not to say anything."

11. Ms. Justice's testimony was also offered to corroborate that "[t]he only one ... [Rosalee] is really afraid of is Jimmy. And the only other thing that Rosalee tells us is, '[a]s long as Mommy is with Jimmy,' she don't want to see Mommy either, because she is afraid of Jimmy."

12. The Appellants, Melissa C. and Doris S., now claim that these statements were "probably tainted and unreliable" since they were "made after many months of counseling and contact with law enforcement and human services support personnel almost exclusively." The record, however, reflects that these statements were admitted in evidence without any objection by any of the Appellants. Moreover, these two children were in separate placements at the time they came forward with their respective statements.

13. The lower court found Rosalee S. psychologically unavailable for testimony. This finding was based on Rosalee's counselor's, Elizabeth Brachna's, testimony that her "concern for ... [Rosa-

lee's] emotional health would be that this child would become extremely agitated, possible very withdrawn and depressed afterwards, as a longterm effect [of testifying]." Moreover, the counselor did not "believe that ... [Rosalee] could verbalize to the Court what she ha[d] told ... [the counselor] in therapeutic sessions[.]" Ms. Brachna also stated that the child is terrified and "feels that she will be killed if she talks about any of these things that she has been told not to say."

While the court made no concomitant finding with respect to Mike C., the Appellee did lay a foundation regarding why this child could not testify. Specifically, when Ms. Lucy Earl, Mike and Scott C.'s therapist, was asked whether Mike or Scott could testify regarding Allen Ray's death, she responded that "[n]either of the boys are able to talk about the death of the baby. They become extremely anxious, very upset.... It would be extremely traumatizing for the children to try to testify." Furthermore, the Appellants did not object to the admissibility of Mike C.'s statements. Since none of the Appellants either objected below, or made this issue the subject of an assignment of error, we need not address it further.

made to their respective therapists. First, Elizabeth Brachna, a counselor at Family Services, Inc. and an expert in the area of child therapy for traumatized children, testified that through her sessions with Rosalee, the child relayed to her essentially the same statement [14] she previously made to Mr. McMullen.[15] Additionally, Rosalee indicated to Ms. Brachna that after Allen Ray turned blue, they returned to the creek again where Jimmy Nance placed the deceased child in the creek and again removed him from the creek. Ms. Brachna testified that Rosalee indicated to her through pictures that Jimmy Nance, Melissa C., Mike and Scott C., as well as Doris S. were present at the creek when Jimmy Nance placed the deceased child in the creek.[16] In response to questioning by David E.'s attorney, Ms. Brachna testified that Rosalee never mentioned the presence of David E. during the shaking incident or later on after that incident.

Next, Lucy Earl, a therapist with Family Service, Inc. and a qualified expert in the area of child abuse and child therapy, testified that Mrs. Miller, the grandmother with whom Mike and Scott C. were placed, called her office requesting services for five-year-old Mike because he was acting out sexually.

Ms. Earl stated that during sessions with Mike, the child kept wanting to talk about the creek. In one of those sessions, Mike stated that "his mommy told him and Jimmy to take Allen Ray to the creek" and that " 'he [Allen Ray] was already dead....' " Mike also stated that "[t]hey put Allen in the creek." Additionally, regarding Mike's brother, seven-year-old Scott, Ms. Earl testified that the only thing that he discussed with her was "a hole that was dug that Mommy and Doris and Jimmy had to fill in before they left the house" the day Allen died.[17] Further, according to Ms. Earl, both children were fearful of talking about Allen Ray's death with her. Finally, Ms. Earl testified that neither child discussed David E. in any fashion.

All the Appellants declined to take the witness stand, upon advice of counsel.[18] Further, none of the Appellants presented any testimony through other witnesses or any evidence in their own defense.

Based on the above-mentioned testimony the lower court terminated the Appellants' parental rights for the following reasons: [19]

1. the unexplained homicide of the infant child, Allen Ray S[ ][.], age 22 months, in April, 1993, while in the custody of the

---

**14.** Ms. Brachna testified that Rosalee told her the same story at least four times and each account of the events was consistent with the prior versions.

**15.** Ms. Brachna used clay and art work in her therapy with Rosalee.

**16.** Corporal Tom McComas of the Cabell County Sheriff's Department offered testimony that he was a hunter and that the placement of the child in the creek postmortem was similar to what some hunters do when they

> kill a large animal ... and they're going to be unable to skin the animal or get it to a meat processing plant for a period of time, there's a chance of spoilage of the meat[.] [I]t's common practice if you're near a creek or a mountain stream to ... put the animal in the stream. That keeps the tissues from spoiling, the blood from really setting in, coagulating in the meat tissues....

The trial court struck the above-mentioned testimony based upon the Appellant's, David E.'s, objection that it was purely speculation.

**17.** Ms. Brachna testified that Rosalee also showed her a hole when she and the child visited the scene during the course of Rosalee's therapy.

Rosalee indicated that it was an area where they played. The Appellee also offered the testimony of Corporal Tom McComas of the Cabell County Sheriff's Department who went to the property and found the hole, thereby corroborating Scott's testimony concerning the existence of a hole.

**18.** The Appellants, Melissa C. and Doris S., assert that the reason they did not testify was somehow connected with a request to have their counsel replaced. A review of the record, however, reflects no correlation between the Appellants' refusal to testify and their request to have new counsel appointed. We, therefore, find no merit regarding the Appellants' assertion.

**19.** The lower court "expressly decline[d] to rule on the parental rights of Brian C[ ][.], father of Brian "Scott" C[ ][.] and Larry "Mike" C[ ][.], and Mark S[ ][.], father of Rosalee S[ ][.], on the grounds that both fathers have represented, through counsel, their willingness to fully and completely relinquish their parental rights to assure permanent placement of their children." At oral argument, we directed the guardian ad litem to obtain from the circuit court the necessary order terminating Brian C.'s and Mark S.'s parental rights in this matter.

respondent adults, Doris S[ ][.], Melissa C[ ][.], and David E[ ][.];

2. the failure of respondents, Doris S[ ][.], Melissa C[ ][.] E[ ][.], and David E[ ][.] to cooperate with law enforcement authorities to solving [sic] the homicide of Allen Ray S[ ][.]; and

3. the absence of any reasonable likelihood that conditions of abuse can be substantially corrected because the respondent, Doris S[ ][.], Melissa C[ ][.] E[ ][.], and David E[ ][.] failed to cooperate in the identification of the person responsible for the homicide of Allen Ray S[ ][.]. . . .

## II.

## CLEAR AND CONVINCING EVIDENCE

### DAVID E.

■ The first issue concerns whether the trial court was presented with the requisite clear and convincing evidence necessary for termination of the Appellant's parental rights. Appellant David E. maintains that the deceased child was not his. Further, he contends that none of the evidence presented before the trial court concerning the deceased child's cause of death implicated him in any way. Finally, he argues that he was asleep in a separate and distinct bedroom at the time the child's death occurred. It is important to note, however, that although David E. makes this last contention on appeal, he presented no evidence whatsoever to support it in the proceeding below. In contrast, the Appellee, as well as the guardian ad litem, contend that David E., as an adult present in the home at the time of Allen Ray's death, had a duty to protect his chil-

dren and Allen Ray from the harm which occurred in the home or, if the opportunity to protect was not available, then the duty to cooperate in identifying the perpetrator. Finally, the Appellee argues that David E. resided with his children in a filthy house at the time his children were removed from his custody, which was indicative of the fact that the Appellant also was ignoring his duty to provide a clean house, plumbing facilities in working order and adequate furnishings for his children.[20]

The thrust of David E.'s argument centers upon the lack of evidence that he was actually present at the time the child was killed and the fact that the deceased child was not his. Based on these factors, he contends that his parental rights were improperly terminated because he did not "*knowingly* or intentionally inflict[ ], attempt to inflict or *knowingly* allow[ ] another person to inflict, physical injury . . . upon . . . another child in the home. . . ." W.Va.Code § 49-1-3(a)(1) (1995) (emphasis added). It is apparent from the statute, however, that the Appellant's contention that the statutory term "knowingly" connotes only actual presence at the time the fatal injury was inflicted is flawed.

■ Implicit in the definition of an abused child under West Virginia Code § 49-1-3 is the child whose health or welfare is harmed or threatened by a parent or guardian who fails to cooperate in identifying the perpetrator of abuse,[21] rather choosing to remain silent. There is no basis in law for requiring that a court be disallowed from considering a parent's or guardian's choice to remain silent as evidence of civil culpability.[22] Moreover,

---

**20.** The DHHR averred in its April 23, 1993, petition seeking the temporary custody of David E.'s children that "the house were [sic] the children reside is filthy, there is inadequate furniture, no bathroom facilities, kitchen is unclean, and there are maggots and rats in one room." The Appellee presented evidence before the trial court which substantiated this allegation, but the lower court made no finding with respect to the condition of the house.

**21.** We have previously held in syllabus point three of *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993) that

[p]arental rights may be terminated where there is clear and convincing evidence that the

infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser. *Id.* at 25-26, 435 S.E.2d at 164.

**22.** Such a parent or guardian may be invoking his/her right to remain silent pursuant to the Fifth Amendment because that individual also may be facing criminal charges arising out of the abuse and neglect of the child. The rights of the criminally accused are sufficiently protected,

the invocation of silence by a parent or guardian in an abuse and neglect proceeding goes to the heart of the treatability question which is essential in these cases, as the nature of the proceedings is remedial and not punitive.[23] Thus, in order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

▆▆▆ Furthermore, as the United States Supreme Court stated in *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), "the prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a *party to a civil cause.*' "[24] *Id.* at 318, 96 S.Ct. at 1558 (quoting 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961); *see* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 5–2(B)(1) (3rd ed.1994). Moreover, "aside from the privilege against

compelled self-incrimination, the Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred by the Due Process Clause." 425 U.S. at 319, 96 S.Ct. at 1558. " 'Silence is often evidence of the most persuasive character.' " *Id.* (quoting *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923)). Accordingly, because the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a lower court may properly consider that individual's silence as affirmative evidence of that individual's culpability.

In the present case, we are hard-pressed to accept David E.'s circuitous reasoning that if one "hears no evil, sees no evil and speaks no evil," then no evil exists. The lower court was presented with clear and convincing, as well as unrefuted, evidence which established that David E. was present in the home where both the deceased child and his children resided at the time the deceased child suffered his fatal injuries. Further, Detective Scheidler, the investigating officer, testified that he did not receive any information from the adults present in the home the night the child died concerning the circumstances leading to the child's death, despite the medical

however, by the following statutory provisions: 1) West Virginia Code § 49–6–4(a) (1995) which allows medical and mental examinations of the child or other parties involved in an abuse and neglect proceeding provides that "[n]o evidence acquired as a result of any such examination of the parent or any other person having custody of the child may be used against such person in any subsequent criminal proceedings against such person; 2) West Virginia Code § 49–7–1 (1995) provides that "[a]ll records of the state department, the court and its officials, law-enforcement agencies and other agencies or facilities concerning a child as defined in this chapter shall be kept confidential and shall not be released . . .[;]" and 3) West Virginia Code § 57–2–3 (1966) provides that "[i]n a criminal prosecution other than for perjury or false swearing, evidence shall not be given against the accused of any statement made by him as a witness upon a legal examination."

**23.** This concept is clearly established by West Virginia Code § 49–1–1(a) (1995) which provides:

(a) The purpose of this chapter is to provide a comprehensive system of child welfare throughout the State which will assure to each child such care and guidance, preferably in his or her home, and will serve the spiritual, emotional, mental and physical welfare of the child; preserve and strengthen the child's family ties whenever possible with recognition of the fundamental rights of parenthood and with recognition of the State's responsibility to assist the family in providing necessary education and training. . . . In pursuit of these goals it is the intention of the legislature to provide for removing the child from the custody of parents only when the child's welfare . . . cannot be adequately safeguarded without removal. . . .
*Id.*

**24.** *See Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (holding that purpose behind Illinois' Sexually Dangerous Persons Act was treatment of sexually dangerous persons; therefore, proceedings conducted pursuant to Act were not considered criminal and privilege was not available).

examiner's report that the child's injuries were sustained as a result of "shaken baby syndrome" and were not consistent with accidental injury. Finally, even though Mike C. and Rosalee S. did not mention David E.'s presence at the time of Allen Ray's death in their respective statements, both statements indicated that Allen Ray's death was caused by his mother's boyfriend, in the home in which David E. was also present.[25] With all the commotion surrounding Allen Ray's death, as described by the children and as substantiated by other evidence submitted before the lower court, we cannot conclude that the lower court was clearly erroneous [26] in its factual determination that the death occurred while the child was in the custody of the Appellants, and that they failed to cooperate in identifying the perpetrator.[27] In the face of knowledge of abuse, David E. chose to remain silent and, thereby, clearly failed to take steps to identify the perpetrator. The failure to identify the abuser creates such a hostile and unsafe atmosphere that it effectively would have placed his children in jeopardy had they remained in his custody. *See In re Jeffrey R.L.*, 190 W.Va. 24, 35, 435 S.E.2d 162, 173 (1993).

## DORIS S. AND MELISSA C.

Like David E., the Appellants, Melissa C. and Doris S., argue that the trial court was not presented with clear and convincing evidence which would justify a termination of their parental rights. As support for their argument, these Appellants assert there was no evidence of abuse and neglect other than "the probably tainted and unreliable proffered statements of the children." Further, the Appellants maintain that there was never a rationally-based allegation that the "living" children were in any kind of danger. Finally, the Appellants contend that they voluntarily did everything in their power to cooperate with law enforcement personnel in investigating Allen Ray's death, yet claim they were deemed uncooperative because they could not provide more information about the child's death and because they would not fabricate an acceptable explanation for the death.[28] In contrast, the Appellee asserts that the Appellants' parental rights were properly terminated on the grounds that there was no reasonable likelihood that conditions of abuse and neglect could be substantially corrected based on the evidence developed which included: 1) the child's death in the Appellants' home; 2) the information supplied by the Appellants was inconsistent with the police investigation and the Appellants failed to cooperate in solving the child's death; and 3) the evidence of the Appellants' gross neglect of these children.

**25.** Even without the statements made by the children Mike C. and Rosalee S., there was still unrefuted evidence that a death, that was determined to be not accidental, occurred in the home occupied by the parents, who are the subject of the present appeal. Additionally, the unrefuted evidence established that not one of those parents came forward with any information or knowledge concerning the death, even though the deceased child presumably laid on the sofa in living room as an inanimate object for a period of time.

**26.** *See In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996) (holding that trial court's findings of fact in abuse and neglect proceedings shall not be set aside by a reviewing court unless clearly erroneous).

**27.** David E. argues that the Appellee failed to present the trial court with clear and convincing evidence that there was no reasonable likelihood that conditions of neglect or abuse could be substantially corrected. West Virginia Code § 49–6–5 (1995) defines "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" as meaning "that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect, on their own or with help." *See id.* § 49–6–5(b). We interpreted the meaning of this phrase in *Jeffrey R.L.*, wherein we held that where a parent has knowledge of abuse and, in the face of such knowledge, fails to take action to identify the abuser, then no reasonable likelihood that the conditions of abuse can be substantially corrected exists. *See* 190 W.Va. at 25–26, 435 S.E.2d at 163–64, Syl. Pt. 3. The record in the instant case demonstrates that the Appellee met its burden concerning this issue and, therefore, the circuit court committed no error with regard to its ruling on this matter.

**28.** We are unpersuaded by the Appellants' attorney's characterization of the events which led to the termination of their parental rights as a witch hunt, arising out of the "unexplained death[]" of a child. To advance such an argument requires one to ignore the uncontroverted evidence in this case that this child's death has a very concrete explanation—an adult shook him to death!

■ First, with regard to Doris S., in syllabus point three of *In re Betty J.W.*, 179 W.Va. 605, 371 S.E.2d 326 (1988), we held that

> W.Va.Code, 49–1–3(a) (1984), in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent.

*Id.* at 606, 371 S.E.2d at 327, Syl. Pt. 3; *see* Syl. Pt. 3, *In re Jeffrey R.L.*, 190 W.Va. at 25–26, 435 S.E.2d at 163–64.

■ The evidence presented against Doris S. included not only the statements made by her daughter and Mike C., which placed her in the room when her son, Allen Ray, suffered his fatal injuries, but also Rosalee's statement to her aunt, that the child's mother had told her not to tell anyone about the events surrounding her brother's death. Moreover, the only explanations [29] offered by Doris S. are inconsistent with the uncontroverted medical evidence admitted before the trial court which established that Allen Ray's death was not accidental in nature. Consequently, it is obvious that Doris S. not only refused to protect her child, but insists on protecting the suspected abuser of her child.[30]

■ With regard to Melissa C.'s contention that clear and convincing evidence was not presented to justify termination of parental rights, West Virginia Code § 49–1–3 defines an abused child as "a child whose health or welfare is harmed or threatened by ... [a] parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home...." *Id.* § 49–1–3(a)(1). Thus, it is clear that pursuant to the provisions of West Virginia Code § 49–1–3(a)(1), the definition of child abuse encompasses a parent, guardian or custodian who knowingly allows another person to inflict physical injury upon another child residing in the same home as the parent and his/her child(ren), even though that child is not the parent's natural or adopted child.

Precedent in this area includes *In re Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985), a case in which the appellant father asserted that his parental rights should not have been terminated because "he was not a direct participant in the acts giving rise to the petition." [31] *Id.* at 141, 331 S.E.2d 873. In upholding the termination,

> [w]e note[d] that appellant ... supports the testimony of his wife entirely, even though the explanation is inconsistent with the medical evidence.[32] Further, he testified that he was in attendance when the first injury to Darla B. occurred, which involved the child's right frontal lobe.[33]

---

29. Both Doris S. and Melissa C. now assert the following: 1) that "the adults could have easily been in their own areas of the house apart from the child" at the time the injuries were sustained; 2) that "[o]ne of the larger children bouncing up and down upon the baby lying on the couch could have easily caused the hemorrhage that resulted in his death[;]" and 3) that there is simply no explanation for the child's death. We are mindful that none of this evidence was presented before the trial court for its consideration in rendering its decision. Moreover, we are not a fact-finding court and, therefore, it is improper for us to consider facts which were not admitted before the trial court.

30. The record reflects that Doris S. continues to associate with the suspected abuser, James Nance, in that she has had a child by him since this termination proceeding originated.

31. The approximately five-week-old infant child was hospitalized after sustaining a skull fracture, a brain contusion, fractures of the leg, arm and collarbone, and swellings over the mouth and eye. *Id.* at 138, 331 S.E.2d at 870.

32. The child's mother testified that the child may have been accidentally injured during an episode in which she determined that her child was not breathing. The mother testified that she shook the child and struck her on the back in an attempt to get the child to start breathing again. *Id.* at 139, 331 S.E.2d at 871 n. 1.

33. The parents claimed that the child was accidentally struck on the left side of her head when the child was being carried by her mother and her head came into contact with a gun rack. *See id.*

Importantly, the explanation given for this injury by both appellants is inconsistent with the medical evidence. Aside from his direct support of his wife's version of the reasons for the infant's injuries, it is ludicrous for him to assert that he should be held blameless for his nonaction in protecting his child.

*Id.* (footnotes added).

Next, in *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991), the Department of Human Services appealed the circuit court's final order which concluded that the appellee father "did not neglect or abuse *his* children ... within the meaning of *W.Va.Code,* 49–1–3 [1984]" and further found that there was no evidence of abuse by the appellee. *Id.* at 193, 406 S.E.2d at 216. The evidence indicated that three-year-old Rebecca, the natural daughter of the appellee's wife, was admitted to the emergency room suffering from severe submersion burns to both her feet; a laceration on one foot; cigarette burns which were secondary to the submersion burns; a laceration on her lip; bruises on her back; and spots on her head where her hair had apparently been pulled out. *Id.* While Rebecca's mother's testimony indicated that all of the child's injuries were accidental in nature, both Rebecca and Scottie D.,[34] the appellee's natural son, who was not adopted by the appellee's wife, testified that the injuries had been intentionally inflicted by the appellee and his wife. *Id.* at 193–94, 406 S.E.2d at 216–17. We found that the father's testimony was

consistent with ... [the mother's] to the extent that it [wa]s supportive of her testimony. In addition to denying the commission of any abusive acts toward the children, the appellee essentially testified that he believed that the injuries to the children occurred in the manner as expressed to him by his wife....

*Id.* at 195, 406 S.E.2d at 218. Finally, the appellee testified that he was not present at the time Rebecca suffered the burns to her feet. *Id.*

■ Upon review, "we fail[ed] to see how the circuit court reached the conclusion that the appellee's children [we]re not abused within the meaning of *W.Va.Code,* 49–1–3 ... insofar as their father is concerned." *Id.* at 197, 406 S.E.2d at 220. Accordingly, we held that

[t]ermination of parental rights of a parent of an abused child is authorized under *W.Va.Code,* 49–6–1 to 49–6–10, as amended, where such parent contends nonparticipation in the acts giving rise to the termination petition but there is clear and convincing evidence that such nonparticipating parent knowingly took no action to prevent or stop such acts to protect the child. Furthermore, termination of parental rights of a parent of an abused child is authorized under *W.Va.Code,* 49–6–1 to 49–6–10, as amended, where such nonparticipating parent supports the other parent's version as to how a child's injuries occurred, but there is clear and convincing evidence that such version is inconsistent with the medical evidence.

185 W.Va. at 197, 406 S.E.2d at 220 and Syl. Pt. 2.

In a case analogous to the instant case, *In re Jeffrey R.L.,* the infant child was diagnosed as suffering from battered child syndrome. Jeffrey R.L.'s mother denied knowing the cause of her child's injuries and suggested that the child had sustained the injuries "while rolling around in his crib." 190 W.Va. at 27, 435 S.E.2d at 165. A pediatrician testified that it would have been "impossible" for Jeffrey to sustain the injuries in the manner suggested by his mother, indicating rather that "great force would be necessary to cause fractures of the ribs, and that the other fractures ... [the child] sustained were 'consistent with a twisting, torsion, shaking of limbs[.]'" *Id.* at 27–28, 435 at 166 (some alterations in original). Both of the child's parents admitted that some trauma occurred, but neither parent admitted to inflicting the trauma upon the child or identified the perpetrator. *Id.* at 29, 435 S.E.2d at 167. Finally, a

---

**34.** There was also evidence of child abuse with regard to Scottie D. *Id.* at 193–94, 406 S.E.2d at 216–17.

DHHR representative testified that while they had no evidence that either of Jeffrey's parents caused his injuries, "if the DHHR does not know who the perpetrator of the abuse is then they believe the child would be at risk to be placed back into the home." *Id.* at 30, 435 S.E.2d at 168.

In determining whether the trial court erred in failing to terminate the parental right of both parents, as well as whether the trial court abused its discretion in returning custody of Jeffrey to his mother, we expounded on the parents' duty to identify the perpetrator of child abuse before a circuit court should ever consider reuniting the child with the parents. *Id.* at 32–35, 435 S.E.2d at 170–73. We adamantly stated that

> [e]stablishing the identity of the person or persons who inflicted these injuries on Jeffrey R.L. is crucial to his health, safety and welfare.... Yet, despite the fact that the perpetrator has not been identified, the circuit court returned custody of Jeffrey R.L. to his mother. We find that the circuit court clearly erred in returning Jeffrey R.L. to his mother before the perpetrator who inflicted such extensive physical abuse on this helpless infant has been identified.

> There is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of Jeffrey R.L.'s physical abuse has not been identified. Jeffrey R.L., due to his young age and physical condition, needs consistent close interaction with fully committed adults. Jeffrey R.L.'s health, safety and welfare would be seriously threatened if he were to be placed back into the environment where he suffered extensive physical injuries when his abuser has not been identified. Therefore, because it appears that Jeffrey R.L.'s abuser will never be identified, this Court will not place him back into the environment where he suffered his abuse.

*Id.* at 35, 435 S.E.2d at 173.

■ We held in syllabus point three of *Jeffrey R.L.* that:

> Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered

extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.

*Id.* at 25–26, 435 S.E.2d at 164; *see In re Danielle T.,* 195 W.Va. 530, 535, 466 S.E.2d 189, 194 (1995) (terminating parental rights and finding that trial court committed reversible error in granting improvement period where neither of child's parents acknowledged abuse or neglect of child and parents "sought to explain Danielle's burn and malnutrition conditions with testimony inconsistent with the medical evidence"); *In re Brianna Elizabeth M.,* 192 W.Va. 363, 367, 452 S.E.2d 454, 458 (1994) (reversing lower court's decision granting father improvement period, where father "insisted that he did not know how such horrendous injuries had been inflicted, and he repeatedly refused to acknowledge that his wife could be the abuser even in the fac[e] of overwhelming medical evidence of extreme child abuse[,]" stating that "the rights of children to be free from abuse require that a parent's first loyalty be to the protection of his or her children"); *State v. Jessica M.,* 191 W.Va. 302, 308, 445 S.E.2d 243, 249 (1994) (stating that "it is further troubling to this Court that ... [mother] has failed to acknowledge ... [husband's] abusive behavior towards her children and to identify him as the abuser").

■ Even though we have recognized "the constitutionally-protected right of the natural parent to the custody of his or her minor children, we have also emphasized that such right is not absolute." *In re Jeffrey R.L.,* 190 W.Va. at 32, 435 S.E.2d at 170. Furthermore, we explained that this right to custody "is limited and qualified by the fitness of the parent to honor the trust of the guardianship and custody of the child." *In re: Willis,* 157 W.Va. 225, 238, 207 S.E.2d 129, 137 (1973). Thus, the above-mentioned case law clearly establishes that the term "knowingly" as used in West Virginia Code § 49–1–3(a)(1), does not require that a parent actually be present at the time the abuse

occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse occurred. This interpretation of the term "knowingly" arises from a parent's paramount duties of loyalty to his/her child(ren) and to provide such child(ren) with a safe environment free from abuse and neglect, both of which are crucial to ensuring a child's health, safety and welfare.

■ Extending our decision in *In re Jeffrey R.L.*, we hold that a parent's parental rights to his/her child(ren) may be terminated: 1) where there is clear and convincing evidence that the parent knowingly allowed another person to inflict extensive physical injury upon another child residing in the same home as the parent and his/her child(ren), even though the injured child is not the parent's natural or adopted child; and 2) where there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parent, even in the face of knowledge of the abuse, has taken no action to identify the abuser. *See* Syl. Pt. 3, 190 W.Va. at 25–26, 435 S.E.2d at 163–64.

We find that even though the deceased child was not Melissa C.'s, she knowingly allowed another person to inflict extensive physical injury upon the child who resided in the same home as she and her children. Unlike the Appellant David E., the clear and convincing evidence established that Melissa C. was actually present at the time her nephew, Allen Ray, was shaken to death. Melissa C., like the other two Appellants, has never taken steps to identify the abuser and has only offered evidence which conflicts with the medical evidence. Thus, both Doris S. and Melissa C. simply have chosen to ignore the unrefuted evidence presented against them, choosing to continue to protect the abuser's

identity. It is that choice which ultimately caused the trial court's proper termination of their parental rights. We therefore find no abuse of discretion.

## B.

### IMPROVEMENT PERIOD

■ The next issue is whether the trial court denied the Appellants a meaningful improvement period. The Appellant David E., without any supporting authority, maintains that he was not given a meaningful improvement period and that only "[t]he guise of a six (6) month improvement period is reflected in a Court Order entered September 14, 1993[.]" The Appellants, Melissa C. and Doris S., maintain that they were never granted an actual improvement period,[35] that the circuit court never made any findings of fact that compelling circumstances existed which justified a denial of an improvement period and that a family case plan was never developed and submitted in accordance with West Virginia Code § 49–6–2(b).[36] The Appellee, however, argues that the record indicates that the Appellant was granted an improvement period.

At the outset we note that the record is clear that all of the Appellants were granted an improvement period. By two separate orders each dated July 8, 1993, each of the Appellants were granted a six-month improvement period, wherein the DHHR was given physical and legal custody of the children, with the Appellants receiving visitation rights. The circuit court, however, placed the following restriction on the improvement period: "A condition of the improvement period shall be that the respondent ... fully cooperate, within Constitutional limits, into the investigation of the death of Alan Ray S[.]. . . ." Thus, the crux of the Appellants' argument is whether the imposition of this

---

**35.** The Appellants also contend, within the same paragraph of their brief, that "[t]hough neither the appellants or their trial counsel knew it, an order granting an improvement period (with the contingency clause regarding their cooperation with law enforcement) was entered[,]" and that they were "denied an improvement period contrary to law."

**36.** The record suggests that the Appellee did develop, prepare and submit a family case plan. An order dated July 8, 1993, provides that "[w]hereupon, respondent, Doris S[.] ..., acknowledged receipt of the Family Service Plan and that she had had time to review the Plan with her counsel." The identical language is also found in a July 8, 1993, order regarding Melissa C.

condition denies them a "meaningful" improvement period.

■ West Virginia Code § 49–6–2(b) provides:

In any proceeding under this article, any parent or custodian may, prior to final hearing, move to be allowed an improvement period of three to twelve months in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. The court shall allow one such improvement period unless it finds compelling circumstances to justify a denial thereof, but may require temporary custody with a responsible relative, which may include any parent, guardian, or other custodian, or the state department or other agency during the improvement period. An order granting such improvement period shall require the department to prepare and submit to the court a family case plan in accordance with the provisions of section three [§ 49–6D–3], article six-d of this chapter.

W.Va.Code § 49–6–2(b). It is clear from the statute that a circuit court may deny an improvement period where "compelling circumstances" exist. *Id.* Further, we have previously determined that the compelling circumstances necessary to deny a request for an improvement period exist where a parent, who knows that abuse has occurred, refuses to identify a perpetrator of abuse and neglect. *In re Jeffrey R. L.,* 190 W.Va. at 35, 435 S.E.2d at 173; *In re Darla B.,* 175 W.Va. at 141, 331 S.E.2d at 872.

Where, however, a circuit court does not deny an improvement period on the grounds of compelling circumstances, we have recently stated the "importance of circuit courts crafting improvement periods in a manner designed to remedy the problem that led to the abuse and neglect action." *In re Renae Ebony W.,* 192 W.Va. 421, 426–27, 452 S.E.2d 737, 742–43 (1994). In *Renae Ebony W.,* we reiterated the principles previously established in *In re Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991):

'The goal [of improvement periods and family case plans] should be the development of a program designed to assist the parent(s) in dealing with any problems which interfere with his ability to be an effective parent and to foster an improved relationship between parent and child with an eventual restoration of full parental rights a hoped-for result. The improvement period and family case plans must establish specific measures for the achievement of these goals, as an improvement period must be more than a mere passage of time. It is a period in which the D.H.S. and the court should attempt to facilitate the parent's success, but wherein the parent must understand that he bears a responsibility to demonstrate sufficient progress and improvement to justify return to him of the child.'

192 W.Va. at 427, 452 S.E.2d at 743 (quoting, in part, *Carlita B.,* 185 W.Va. at 625, 408 S.E.2d at 377) (alteration not in original).

It is apparent in this case that the circuit court decided to give the Appellants another opportunity to determine whether their priorities lay in protecting the safety of their children or in protecting the abuser, rather than to deny outright their request for an improvement period. The circuit court's opinion reflects its attempt to design an improvement period which would help the Appellants remedy the abuse and neglect. In order to achieve that goal, the circuit court determined that it was vitally important for the Appellants to cooperate with law enforcement and that such abuse and neglect could not be remedied without that necessary cooperation. Consequently, the imposition of such a condition comports with this Court's recent decisions in which we have found that circuit courts have erroneously granted improvement periods where the parents have either failed to acknowledge that any abuse and neglect have occurred and/or refused to identify the abuser, where there was knowledge of abuse. *See In re Danielle T.,* 195 W.Va. at 535, 466 S.E.2d at 194 (finding that circuit court improperly granted improvement period where parents failed to identify abuser and failed to acknowledge that abuse and neglect of child had occurred); *In re Jeffrey R.L.,* 190 W.Va. at 35, 435 S.E.2d at 173 (stating that "reunification between Jeffrey R.L. and his parents is not in his best interests because his parents have not identi-

fied his abuser"); *see also* Syllabus, *In re Renae Ebony W.*, 192 W.Va. at 422, 452 S.E.2d at 738 (holding that in-home improvement periods should not be granted where child removed from home on emergency basis because of finding of imminent danger until circumstances constituting imminent danger cease to exist or alleged abusing person has been precluded from residing in or visiting home). Therefore, the Appellants were not denied a meaningful improvement period simply because they were required to cooperate with law enforcement.

Based on the foregoing opinion, we find that the Circuit Court of Cabell County committed no error and, accordingly, affirm.

Affirmed.